OLMSTEAD, COMMISSIONER, GEORGIA DEPART-
MENT OF HUMAN RESOURCES, ET AL. *v.* L. C.,
BY ZIMRING, GUARDIAN AD LITEM AND NEXT
FRIEND, ET AL.

No. 98–536.   Argued April 21, 1999—Decided June 22, 1999

582

GINSBURG, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–A, in which STEVENS, O'CONNOR, SOUTER, and BREYER, JJ., joined, and an opin-

ion with respect to Part III–B, in which O'CONNOR, SOUTER, and BREYER, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 607. KENNEDY, J., filed an opinion concurring in the judgment, in which BREYER, J., joined as to Part I, *post*, p. 608. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 615.

*Beverly Patricia Downing*, Senior Assistant Attorney General of Georgia, argued the cause for petitioners. With her on the briefs were *Thurbert E. Baker*, Attorney General, *Kathleen M. Pacious*, Deputy Attorney General, *Jefferson James Davis*, Special Assistant Attorney General, and *Jeffrey S. Sutton*.

*Michael H. Gottesman* argued the cause for respondents. With him on the brief were *Steven D. Caley, Susan C. Jamieson*, and *David A. Webster*.

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, Jessica Dunsay Silver*, and *Gregory B. Friel.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Nevada et al. by *Frankie Sue Del Papa*, Attorney General of Nevada, and *Anne B. Cathcart*, Special Assistant Attorney General, *Mike Moore*, Attorney General of Mississippi, and *Robert E. Sanders*, Assistant Attorney General, *John Cornyn*, Attorney General of Texas, *Andy Taylor*, First Assistant Attorney General, *Linda S. Eads*, Deputy Attorney General, and *Gregory S. Coleman*, Solicitor General, and by the Attorneys General for their respective States as follows: *Ken L. Salazar* of Colorado, *Jeffrey A. Modisett* of Indiana, *Margery S. Bronster* of Hawaii, *Richard P. Ieyoub* of Louisiana, *Thomas F. Reilly* of Massachusetts, *Joseph P. Mazurek* of Montana, *Charles M. Condon* of South Carolina, *Paul G. Summers* of Tennessee, *Christine O. Gregoire* of Washington, and *Gay Woodhouse* of Wyoming; and for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley*.

Briefs of *amici curiae* urging affirmance were filed for the American Association on Mental Retardation et al. by *Alan M. Wiseman, Timothy K. Armstrong*, and *Ira A. Burnim;* for the American Civil Liberties Union et al. by *Laurie Webb Daniel* and *Steven R. Shapiro;* for the American

JUSTICE GINSBURG announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–A, and an opinion with respect to Part III–B, in which JUSTICE O'CONNOR, JUSTICE SOUTER, and JUSTICE BREYER join.

This case concerns the proper construction of the anti-discrimination provision contained in the public services portion (Title II) of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, 42 U. S. C. § 12132. Specifically, we confront the question whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions. The answer, we hold, is a qualified yes. Such action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities. In so ruling, we affirm the decision of the Eleventh Circuit in substantial part. We remand the case, however, for further consideration of the appropriate relief, given the range of facilities the State maintains for the care and treatment of persons with diverse mental disabilities, and its obligation to administer services with an even hand.

Psychiatric Association et al. by *Richard G. Taranto;* for 58 Former State Commissioners and Directors of Mental Health and Developmental Disabilities et al. by *Neil V. McKittrick;* for the National Council on Disability by *Robert L. Burgdorf, Jr.;* for the National Mental Health Consumers' Self-Help Clearinghouse et al. by *Loralyn McKinley;* for Dick Thornburgh et al. by *Mr. Thornburgh, pro se, James E. Day,* and *David R. Fine;* for People First of Georgia et al. by *Thomas K. Gilhool;* and for the Voice of the Retarded et al. by *William J. Burke* and *Tamie Hopp.*

*Stephen F. Gold* filed a brief for ADAPT et al. as *amici curiae.*

I

This case, as it comes to us, presents no constitutional question. The complaints filed by plaintiffs-respondents L. C. and E. W. did include such an issue; L. C. and E. W. alleged that defendants-petitioners, Georgia health care officials, failed to afford them minimally adequate care and freedom from undue restraint, in violation of their rights under the Due Process Clause of the Fourteenth Amendment. See Complaint ¶¶ 87–91; Intervenor's Complaint ¶¶ 30–34. But neither the District Court nor the Court of Appeals reached those Fourteenth Amendment claims. See Civ. No. 1:95–cv–1210–MHS (ND Ga., Mar. 26, 1997), pp. 5–6, 11–13, App. to Pet. for Cert. 34a–35a, 40a–41a; 138 F. 3d 893, 895, and n. 3 (CA11 1998). Instead, the courts below resolved the case solely on statutory grounds. Our review is similarly confined. Cf. *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 450 (1985) (Texas city's requirement of special use permit for operation of group home for mentally retarded, when other care and multiple-dwelling facilities were freely permitted, lacked rational basis and therefore violated Equal Protection Clause of Fourteenth Amendment). Mindful that it is a statute we are construing, we set out first the legislative and regulatory prescriptions on which the case turns.

In the opening provisions of the ADA, Congress stated findings applicable to the statute in all its parts. Most relevant to this case, Congress determined that

> "(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> "(3) discrimination against individuals with disabilities persists in such critical areas as ... institutionalization ... ;

"(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] segregation . . . ." 42 U. S. C. §§ 12101(a)(2), (3), (5).[1]

Congress then set forth prohibitions against discrimination in employment (Title I, §§ 12111–12117), public services furnished by governmental entities (Title II, §§ 12131–12165), and public accommodations provided by private entities (Title III, §§ 12181–12189). The statute as a whole is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." § 12101(b)(1).[2]

This case concerns Title II, the public services portion of the ADA.[3] The provision of Title II centrally at issue reads:

"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such

[1] The ADA, enacted in 1990, is the Federal Government's most recent and extensive endeavor to address discrimination against persons with disabilities. Earlier legislative efforts included the Rehabilitation Act of 1973, 87 Stat. 355, 29 U. S. C. § 701 et seq. (1976 ed.), and the Developmentally Disabled Assistance and Bill of Rights Act, 89 Stat. 486, 42 U. S. C. § 6001 et seq. (1976 ed.), enacted in 1975. In the ADA, Congress for the first time referred expressly to "segregation" of persons with disabilities as a "for[m] of discrimination," and to discrimination that persists in the area of "institutionalization." §§ 12101(a)(2), (3), (5).

[2] The ADA defines "disability," "with respect to an individual," as

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

"(B) a record of such an impairment; or

"(C) being regarded as having such an impairment." § 12102(2).

There is no dispute that L. C. and E. W. are disabled within the meaning of the ADA.

[3] In addition to the provisions set out in Part A governing public services generally, see §§ 12131–12134, Title II contains in Part B a host of provisions governing public transportation services, see §§ 12141–12165.

disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 201, as set forth in 42 U. S. C. § 12132.

Title II's definition section states that "public entity" includes "any State or local government," and "any department, agency, [or] special purpose district." §§ 12131(1)(A), (B). The same section defines "qualified individual with a disability" as

"an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2).

On redress for violations of § 12132's discrimination prohibition, Congress referred to remedies available under § 505 of the Rehabilitation Act of 1973, 92 Stat. 2982, 29 U. S. C. § 794a. See § 203, as set forth in 42 U. S. C. § 12133 ("The remedies, procedures, and rights set forth in [§ 505 of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").[4]

---

[4] Section 505 of the Rehabilitation Act incorporates the remedies, rights, and procedures set forth in Title VI of the Civil Rights Act of 1964 for violations of § 504 of the Rehabilitation Act. See 29 U. S. C. § 794a(a)(2). Title VI, in turn, directs each federal department authorized to extend financial assistance to any department or agency of a State to issue rules and regulations consistent with achievement of the objectives of the statute authorizing financial assistance. See 78 Stat. 252, 42 U. S. C. § 2000d–1. Compliance with such requirements may be effected by the termination or denial of federal funds, or "by any other means authorized by law." *Ibid.* Remedies both at law and in equity are available for violations of the statute. See § 2000d–7(a)(2).

Congress instructed the Attorney General to issue regulations implementing provisions of Title II, including §12132's discrimination proscription. See §204, as set forth in §12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part.").[5] The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations . . . applicable to recipients of Federal financial assistance under [§504 of the Rehabilitation Act]." §204, as set forth in 42 U. S. C. §12134(b). One of the §504 regulations requires recipients of federal funds to "administer programs and activities in the most integrated

---

[5] Congress directed the Secretary of Transportation to issue regulations implementing the portion of Title II concerning public transportation. See 42 U. S. C. §§12143(b), 12149, 12164. As stated in the regulations, a person alleging discrimination on the basis of disability in violation of Title II may seek to enforce its provisions by commencing a private lawsuit, or by filing a complaint with (a) a federal agency that provides funding to the public entity that is the subject of the complaint, (b) the Department of Justice for referral to an appropriate agency, or (c) one of eight federal agencies responsible for investigating complaints arising under Title II: the Department of Agriculture, the Department of Education, the Department of Health and Human Services, the Department of Housing and Urban Development, the Department of the Interior, the Department of Justice, the Department of Labor, and the Department of Transportation. See 28 CFR §§35.170(c), 35.172(b), 35.190(b) (1998).

The ADA contains several other provisions allocating regulatory and enforcement responsibility. Congress instructed the Equal Employment Opportunity Commission (EEOC) to issue regulations implementing Title I, see 42 U. S. C. §12116; the EEOC, the Attorney General, and persons alleging discrimination on the basis of disability in violation of Title I may enforce its provisions, see §12117(a). Congress similarly instructed the Secretary of Transportation and the Attorney General to issue regulations implementing provisions of Title III, see §§12186(a)(1), (b); the Attorney General and persons alleging discrimination on the basis of disability in violation of Title III may enforce its provisions, see §§12188(a)(1), (b). Each federal agency responsible for ADA implementation may render technical assistance to affected individuals and institutions with respect to provisions of the ADA for which the agency has responsibility. See §12206(c)(1).

setting appropriate to the needs of qualified handicapped persons." 28 CFR § 41.51(d) (1998).

As Congress instructed, the Attorney General issued Title II regulations, see 28 CFR pt. 35 (1998), including one modeled on the § 504 regulation just quoted; called the "integration regulation," it reads:

> "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d) (1998).

The preamble to the Attorney General's Title II regulations defines "the most integrated setting appropriate to the needs of qualified individuals with disabilities" to mean "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 CFR pt. 35, App. A, p. 450 (1998). Another regulation requires public entities to "make reasonable modifications" to avoid "discrimination on the basis of disability," unless those modifications would entail a "fundamenta[l] alter[ation]"; called here the "reasonable-modifications regulation," it provides:

> "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7) (1998).

We recite these regulations with the caveat that we do not here determine their validity. While the parties differ on the proper construction and enforcement of the regulations, we do not understand petitioners to challenge the regulatory formulations themselves as outside the congressional authorization. See Brief for Petitioners 16–17, 36, 40–41;

Reply Brief 15–16 (challenging the Attorney General's interpretation of the integration regulation).

## II

With the key legislative provisions in full view, we summarize the facts underlying this dispute. Respondents L. C. and E. W. are mentally retarded women; L. C. has also been diagnosed with schizophrenia, and E. W. with a personality disorder. Both women have a history of treatment in institutional settings. In May 1992, L. C. was voluntarily admitted to Georgia Regional Hospital at Atlanta (GRH), where she was confined for treatment in a psychiatric unit. By May 1993, her psychiatric condition had stabilized, and L. C.'s treatment team at GRH agreed that her needs could be met appropriately in one of the community-based programs the State supported. Despite this evaluation, L. C. remained institutionalized until February 1996, when the State placed her in a community-based treatment program.

E. W. was voluntarily admitted to GRH in February 1995; like L. C., E. W. was confined for treatment in a psychiatric unit. In March 1995, GRH sought to discharge E. W. to a homeless shelter, but abandoned that plan after her attorney filed an administrative complaint. By 1996, E. W.'s treating psychiatrist concluded that she could be treated appropriately in a community-based setting. She nonetheless remained institutionalized until a few months after the District Court issued its judgment in this case in 1997.

In May 1995, when she was still institutionalized at GRH, L. C. filed suit in the United States District Court for the Northern District of Georgia, challenging her continued confinement in a segregated environment. Her complaint invoked 42 U. S. C. § 1983 and provisions of the ADA, §§ 12131–12134, and named as defendants, now petitioners, the Commissioner of the Georgia Department of Human Resources, the Superintendent of GRH, and the Executive Director of the Fulton County Regional Board (collectively,

the State). L. C. alleged that the State's failure to place her in a community-based program, once her treating professionals determined that such placement was appropriate, violated, *inter alia,* Title II of the ADA. L. C.'s pleading requested, among other things, that the State place her in a community care residential program, and that she receive treatment with the ultimate goal of integrating her into the mainstream of society. E. W. intervened in the action, stating an identical claim.[6]

The District Court granted partial summary judgment in favor of L. C. and E. W. See App. to Pet. for Cert. 31a–42a. The court held that the State's failure to place L. C. and E. W. in an appropriate community-based treatment program violated Title II of the ADA. See *id.,* at 39a, 41a. In so ruling, the court rejected the State's argument that inadequate funding, not discrimination against L. C. and E. W. "by reason of" their disabilities, accounted for their retention at GRH. Under Title II, the court concluded, "unnecessary institutional segregation of the disabled constitutes discrimination *per se,* which cannot be justified by a lack of funding." *Id.,* at 37a.

In addition to contending that L. C. and E. W. had not shown discrimination "by reason of [their] disabilit[ies]," the State resisted court intervention on the ground that requiring immediate transfers in cases of this order would "fundamentally alter" the State's activity. The State reasserted that it was already using all available funds to provide services to other persons with disabilities. See *id.,* at 38a. Re-

---

[6] L. C. and E. W. are currently receiving treatment in community-based programs. Nevertheless, the case is not moot. As the District Court and Court of Appeals explained, in view of the multiple institutional placements L. C. and E. W. have experienced, the controversy they brought to court is "capable of repetition, yet evading review." No. 1:95–cv–1210–MHS (ND Ga., Mar. 26, 1997), p. 6, App. to Pet. for Cert. 35a (internal quotation marks omitted); see 138 F. 3d 893, 895, n. 2 (CA11 1998) (citing *Honig* v. *Doe,* 484 U. S. 305, 318–323 (1988), and *Vitek* v. *Jones,* 445 U. S. 480, 486–487 (1980)).

jecting the State's "fundamental alteration" defense, the court observed that existing state programs provided community-based treatment of the kind for which L. C. and E. W. qualified, and that the State could "provide services to plaintiffs in the community at considerably *less* cost than is required to maintain them in an institution." *Id.*, at 39a.

The Court of Appeals for the Eleventh Circuit affirmed the judgment of the District Court, but remanded for reassessment of the State's cost-based defense. See 138 F. 3d, at 905. As the appeals court read the statute and regulations: When "a disabled individual's treating professionals find that a community-based placement is appropriate for that individual, the ADA imposes a duty to provide treatment in a community setting—the most integrated setting appropriate to that patient's needs"; "[w]here there is no such finding [by the treating professionals], nothing in the ADA requires the deinstitutionalization of th[e] patient." *Id.*, at 902.

The Court of Appeals recognized that the State's duty to provide integrated services "is not absolute"; under the Attorney General's Title II regulation, "reasonable modifications" were required of the State, but fundamental alterations were not demanded. *Id.*, at 904. The appeals court thought it clear, however, that "Congress wanted to permit a cost defense only in the most limited of circumstances." *Id.*, at 902. In conclusion, the court stated that a cost justification would fail "[u]nless the State can prove that requiring it to [expend additional funds in order to provide L. C. and E. W. with integrated services] would be so unreasonable given the demands of the State's mental health budget that it would fundamentally alter the service [the State] provides." *Id.*, at 905. Because it appeared that the District Court had entirely ruled out a "lack of funding" justification, see App. to Pet. for Cert. 37a, the appeals court remanded, repeating that the District Court should consider, among other things, "whether the additional expenditures necessary to treat L. C. and E. W. in community-based care would be unreason-

able given the demands of the State's mental health budget."
138 F. 3d, at 905.[7]

We granted certiorari in view of the importance of the
question presented to the States and affected individuals.
See 525 U. S. 1054 (1998).[8]

### III

Endeavoring to carry out Congress' instruction to issue
regulations implementing Title II, the Attorney General,
in the integration and reasonable-modifications regulations,
see *supra*, at 591–592, made two key determinations. The
first concerned the scope of the ADA's discrimination pro-
scription, 42 U. S. C. § 12132; the second concerned the obli-
gation of the States to counter discrimination. As to the
first, the Attorney General concluded that unjustified place-
ment or retention of persons in institutions, severely limiting
their exposure to the outside community, constitutes a form
of discrimination based on disability prohibited by Title II.
See 28 CFR § 35.130(d) (1998) ("A public entity shall admin-
ister services . . . in the most integrated setting appropriate
to the needs of qualified individuals with disabilities."); Brief
for United States as *Amicus Curiae* in *Helen L.* v. *DiDario*,
No. 94–1243 (CA3 1994), pp. 8, 15–16 (unnecessary segre-
gation of persons with disabilities constitutes a form of
discrimination prohibited by the ADA and the integration

---

[7] After this Court granted certiorari, the District Court issued a de-
cision on remand rejecting the State's fundamental-alteration defense.
See 1:95–cv–1210–MHS (ND Ga., Jan. 29, 1999), p. 1. The court concluded
that the annual cost to the State of providing community-based treatment
to L. C. and E. W. was not unreasonable in relation to the State's overall
mental health budget. See *id.*, at 5. In reaching that judgment, the Dis-
trict Court first declared "irrelevant" the potential impact of its decision
beyond L. C. and E. W. 1:95–cv–1210-MHS (ND Ga., Oct. 20, 1998), p. 3,
App. 177. The District Court's decision on remand is now pending appeal
before the Eleventh Circuit.

[8] Twenty-two States and the Territory of Guam joined a brief urging
that certiorari be granted. Ten of those States joined a brief in support
of petitioners on the merits.

regulation). Regarding the States' obligation to avoid un-justified isolation of individuals with disabilities, the Attor-ney General provided that States could resist modifications that "would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7) (1998).

The Court of Appeals essentially upheld the Attorney General's construction of the ADA. As just recounted, see *supra,* at 595–596, the appeals court ruled that the unjusti-fied institutionalization of persons with mental disabilities violated Title II; the court then remanded with instruc-tions to measure the cost of caring for L. C. and E. W. in a community-based facility against the State's mental health budget.

We affirm the Court of Appeals' decision in substantial part. Unjustified isolation, we hold, is properly regarded as discrimination based on disability. But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabili-ties, and the States' obligation to administer services with an even hand. Accordingly, we further hold that the Court of Appeals' remand instruction was unduly restrictive. In evaluating a State's fundamental-alteration defense, the Dis-trict Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obli-gation to mete out those services equitably.

A

We examine first whether, as the Eleventh Circuit held, undue institutionalization qualifies as discrimination "by rea-son of . . . disability." The Department of Justice has con-sistently advocated that it does.[9] Because the Department

---

[9] See Brief for United States in *Halderman* v. *Pennhurst State School and Hospital,* Nos. 78–1490, 78–1564, 78–1602 (CA3 1978), p. 45 ("[I]nstitu-tionalization result[ing] in separation of mentally retarded persons for no

is the agency directed by Congress to issue regulations implementing Title II, see *supra,* at 591–592, its views warrant respect. We need not inquire whether the degree of deference described in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 844 (1984), is in order; "[i]t is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Bragdon* v. *Abbott,* 524 U. S. 624, 642 (1998) (quoting *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 139–140 (1944)).

The State argues that L. C. and E. W. encountered no discrimination "by reason of" their disabilities because they were not denied community placement on account of those disabilities. See Brief for Petitioners 20. Nor were they subjected to "discrimination," the State contends, because "'discrimination' necessarily requires uneven treatment of similarly situated individuals," and L. C. and E. W. had identified no comparison class, *i. e.,* no similarly situated individuals given preferential treatment. *Id.,* at 21. We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA.[10]

---

permissible reason . . . is 'discrimination,' and a violation of Section 504 [of the Rehabilitation Act] if it is supported by federal funds."); Brief for United States in *Halderman* v. *Pennhurst State School and Hospital,* Nos. 78–1490, 78–1564, 78–1602 (CA3 1981), p. 27 ("Pennsylvania violates Section 504 by indiscriminately subjecting handicapped persons to [an institution] without first making an individual reasoned professional judgment as to the appropriate placement for each such person among all available alternatives."); Brief for United States as *Amicus Curiae* in *Helen L.* v. *DiDario,* No. 94–1243 (CA3 1994), p. 7 ("Both the Section 504 coordination regulations and the rest of the ADA make clear that the unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of discrimination within the meaning of those statutes."); *id.,* at 8–16.

[10] The dissent is driven by the notion that "this Court has never endorsed an interpretation of the term 'discrimination' that encompassed disparate treatment among members of the *same* protected class," *post,* at 616 (opinion of THOMAS, J.), that "[o]ur decisions construing various

The ADA stepped up earlier measures to secure opportunities for people with developmental disabilities to enjoy the benefits of community living. The Developmentally Disabled Assistance and Bill of Rights Act, a 1975 measure, stated in aspirational terms that "[t]he treatment, services, and habilitation for a person with developmental disabilities . . . *should be* provided in the setting that is least restrictive of the person's personal liberty." 89 Stat. 502, 42 U. S. C. § 6010(2) (1976 ed.) (emphasis added); see also *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 24 (1981) (concluding that the § 6010 provisions "were intended to be hortatory, not mandatory"). In a related legislative endeavor, the Rehabilitation Act of 1973, Congress used mandatory language to proscribe discrimination against persons with disabilities. See 87 Stat. 394, as amended, 29 U. S. C. § 794 (1976 ed.) ("No otherwise qualified individual with a disability in the United States . . . *shall,* solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal fi-

statutory prohibitions against 'discrimination' have not wavered from this path," *post,* at 616, and that "a plaintiff cannot prove 'discrimination' by demonstrating that one member of a particular protected group has been favored over another member of that same group," *post,* at 618. The dissent is incorrect as a matter of precedent and logic. See *O'Connor* v. *Consolidated Coin Caterers Corp.,* 517 U. S. 308, 312 (1996) (The Age Discrimination in Employment Act of 1967 "does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.*"); cf. *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U. S. 75, 76 (1998) ("[W]orkplace harassment can violate Title VII's prohibition against 'discriminat[ion] . . . because of . . . sex,' 42 U. S. C. § 2000e-2(a)(1), when the harasser and the harassed employee are of the same sex."); *Jefferies* v. *Harris County Community Action Assn.,* 615 F. 2d 1025, 1032 (CA5 1980) ("[D]iscrimination against black females can exist even in the absence of discrimination against black men or white women.").

nancial assistance." (Emphasis added.)) Ultimately, in the ADA, enacted in 1990, Congress not only required all public entities to refrain from discrimination, see 42 U. S. C. § 12132; additionally, in findings applicable to the entire statute, Congress explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination." See § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including . . . segregation").[11]

Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. Cf. *Allen* v. *Wright*, 468 U. S. 737, 755 (1984) ("There can be no doubt that [stigmatizing injury often caused by racial discrimination] is one of the most serious consequences of discriminatory government action."); *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 707, n. 13 (1978) ("'In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" (quoting *Sprogis* v. *United Air Lines, Inc.*, 444 F. 2d 1194, 1198 (CA7

---

[11] Unlike the ADA, § 504 of the Rehabilitation Act contains no express recognition that isolation or segregation of persons with disabilities is a form of discrimination. Section 504's discrimination proscription, a single sentence attached to vocational rehabilitation legislation, has yielded divergent court interpretations. See Brief for United States as *Amicus Curiae* 23–25.

1971)).   Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.   See Brief for American Psychiatric Association et al. as *Amici Curiae* 20–22.   Dissimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice. See Brief for United States as *Amicus Curiae* 6–7, 17.

The State urges that, whatever Congress may have stated as its findings in the ADA, the Medicaid statute "reflected a congressional policy preference for treatment in the institution over treatment in the community."   Brief for Petitioners 31.   The State correctly used the past tense.   Since 1981, Medicaid has provided funding for state-run home and community-based care through a waiver program.   See 95 Stat. 812–813, as amended, 42 U. S. C. § 1396n(c); Brief for United States as *Amicus Curiae* 20–21.[12]   Indeed, the United States points out that the Department of Health and Human Services (HHS) "has a policy of encouraging States to take advantage of the waiver program, and often approves more waiver slots than a State ultimately uses."   *Id.*, at 25–26 (further observing that, by 1996, "HHS approved up to 2109 waiver slots for Georgia, but Georgia used only 700").

We emphasize that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community

---

[12] The waiver program provides Medicaid reimbursement to States for the provision of community-based services to individuals who would otherwise require institutional care, upon a showing that the average annual cost of such services is not more than the annual cost of institutional services.   See § 1396n(c).

settings. Title II provides only that "qualified individual[s] with a disability" may not "be subjected to discrimination." 42 U. S. C. § 12132. "Qualified individuals," the ADA further explains, are persons with disabilities who, "with or without reasonable modifications to rules, policies, or practices, . . . mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2).

Consistent with these provisions, the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual "meets the essential eligibility requirements" for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting. See 28 CFR § 35.130(d) (1998) (public entity shall administer services and programs in "the most integrated setting *appropriate* to the needs of qualified individuals with disabilities" (emphasis added)); cf. *School Bd. of Nassau Cty. v. Arline*, 480 U. S. 273, 288 (1987) ("[C]ourts normally should defer to the reasonable medical judgments of public health officials.").[18] Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it. See 28 CFR § 35.130(e)(1) (1998) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept."); 28 CFR pt. 35, App. A, p. 450 (1998) ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation."). In this case, however, there is no genuine dispute concerning the status of L. C. and E. W. as individuals "quali-

---

[18] Georgia law also expresses a preference for treatment in the most integrated setting appropriate. See Ga. Code Ann. § 37-4-121 (1995) ("It is the policy of the state that the least restrictive alternative placement be secured for every client at every stage of his habilitation. It shall be the duty of the facility to assist the client in securing placement in noninstitutional community facilities and programs.").

fied" for noninstitutional care: The State's own professionals determined that community-based treatment would be appropriate for L. C. and E. W., and neither woman opposed such treatment. See *supra*, at 593.[14]

## B

The State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless. The reasonable-modifications regulation speaks of "reasonable modifications" to avoid discrimination, and allows States to resist modifications that entail a "fundamenta[l] alter[ation]" of the States' services and programs. 28 CFR § 35.130(b)(7) (1998). The Court of Appeals construed this regulation to permit a cost-based defense "only in the most limited of circumstances," 138 F. 3d, at 902, and remanded to the District Court to consider, among other things, "whether the additional expenditures necessary to treat L. C. and E. W. in community-based care would be unreasonable given the demands of the State's mental health budget," *id.*, at 905.

The Court of Appeals' construction of the reasonable-modifications regulation is unacceptable for it would leave the State virtually defenseless once it is shown that the plaintiff is qualified for the service or program she seeks. If the expense entailed in placing one or two people in a community-based treatment program is properly measured for reasonableness against the State's entire mental health budget, it is unlikely that a State, relying on the fundamental-alteration defense, could ever prevail. See Tr. of Oral Arg. 27 (State's attorney argues that Court of Appeals' understanding of the

---

[14] We do not in this opinion hold that the ADA imposes on the States a "standard of care" for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities." Cf. *post*, at 623, 624 (THOMAS, J., dissenting). We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.

fundamental-alteration defense, as expressed in its order to the District Court, "will always preclude the State from a meaningful defense"); cf. Brief for Petitioners 37–38 (Court of Appeals' remand order "mistakenly asks the district court to examine [the fundamental-alteration] defense based on the cost of providing community care to just two individuals, not all Georgia citizens who desire community care"); 1:95–cv–1210–MHS (ND Ga., Oct. 20, 1998), p. 3, App. 177 (District Court, on remand, declares the impact of its decision beyond L. C. and E. W. "irrelevant"). Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

When it granted summary judgment for plaintiffs in this case, the District Court compared the cost of caring for the plaintiffs in a community-based setting with the cost of caring for them in an institution. That simple comparison showed that community placements cost less than institutional confinements. See App. to Pet. for Cert. 39a. As the United States recognizes, however, a comparison so simple overlooks costs the State cannot avoid; most notably, a "State . . . may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions." Brief for United States as *Amicus Curiae* 21.[15]

As already observed, see *supra*, at 601–602, the ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk. Cf. *post*, at

---

[15] Even if States eventually were able to close some institutions in response to an increase in the number of community placements, the States would still incur the cost of running partially full institutions in the interim. See Brief for United States as *Amicus Curiae* 21.

610 (KENNEDY, J., concurring in judgment). Nor is it the ADA's mission to drive States to move institutionalized patients into an inappropriate setting, such as a homeless shelter, a placement the State proposed, then retracted, for E. W. See *supra*, at 593. Some individuals, like L. C. and E. W. in prior years, may need institutional care from time to time "to stabilize acute psychiatric symptoms." App. 98 (affidavit of Dr. Richard L. Elliott); see 138 F. 3d, at 903 ("[T]here may be times [when] a patient can be treated in the community, and others whe[n] an institutional placement is necessary."); Reply Brief 19 (placement in a community-based treatment program does not mean the State will no longer need to retain hospital accommodations for the person so placed). For other individuals, no placement outside the institution may ever be appropriate. See Brief for American Psychiatric Association et al. as *Amici Curiae* 22–23 ("Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times—perhaps in the short run, perhaps in the long run—for the risks and exposure of the less protective environment of community settings"; for these persons, "institutional settings are needed and must remain available."); Brief for Voice of the Retarded et al. as *Amici Curiae* 11 ("Each disabled person is entitled to treatment in the most integrated setting possible for that person—recognizing that, on a case-by-case basis, that setting may be in an institution."); *Youngberg* v. *Romeo*, 457 U. S. 307, 327 (1982) (Blackmun, J., concurring) ("For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.").

To maintain a range of facilities and to administer services with an even hand, the State must have more leeway than the courts below understood the fundamental-alteration defense to allow. If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan

for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met. See Tr. of Oral Arg. 5 (State's attorney urges that, "by asking [a] person to wait a short time until a community bed is available, Georgia does not exclude [that] person by reason of disability, neither does Georgia discriminate against her by reason of disability"); see also *id.*, at 25 ("[I]t is reasonable for the State to ask someone to wait until a community placement is available."). In such circumstances, a court would have no warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions.[16]

---

[16] We reject the Court of Appeals' construction of the reasonable-modifications regulation for another reason. The Attorney General's Title II regulations, Congress ordered, "shall be consistent with" the regulations in part 41 of Title 28 of the Code of Federal Regulations implementing § 504 of the Rehabilitation Act. 42 U. S. C. § 12134(b). The § 504 regulation upon which the reasonable-modifications regulation is based provides now, as it did at the time the ADA was enacted:

"A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 CFR § 41.53 (1990 and 1998 eds.).

While the part 41 regulations do not define "undue hardship," other § 504 regulations make clear that the "undue hardship" inquiry requires not simply an assessment of the cost of the accommodation in relation to the recipient's overall budget, but a "case-by-case analysis weighing factors that include: (1) [t]he overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget; (2) [t]he type of the recipient's operation, including the composition and structure of the recipient's workforce; and (3) [t]he nature and cost of the accommodation needed." 28 CFR § 42.511(c) (1998); see 45 CFR § 84.12(c) (1998) (same).

Under the Court of Appeals' restrictive reading, the reasonable-modifications regulation would impose a standard substantially more

\* \* \*

For the reasons stated, we conclude that, under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities. The judgment of the Eleventh Circuit is therefore affirmed in part and vacated in part, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

Unjustified disparate treatment, in this case, "unjustified institutional isolation," constitutes discrimination under the Americans with Disabilities Act of 1990. See *ante,* at 600. If a plaintiff requests relief that requires modification of a State's services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs. In this case, the Court of Appeals appropriately remanded for consideration of the State's affirmative defense. On remand, the District Court rejected the State's "fundamental-alteration defense." See *ante,* at 596, n. 7. If the District Court was wrong in concluding that costs unrelated to the treatment of L. C. and E. W. do not support such a defense in this case, that arguable error should be corrected either by the Court of Appeals or by this Court in review of that decision. In my opinion, therefore, we should simply affirm the judgment of the Court of Appeals.

difficult for the State to meet than the "undue burden" standard imposed by the corresponding §504 regulation.

But because there are not five votes for that disposition, I join the Court's judgment and Parts I, II, and III–A of its opinion. Cf. *Bragdon* v. *Abbott,* 524 U. S. 624, 655–656 (1998) (STEVENS, J., concurring); *Screws* v. *United States,* 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result).

JUSTICE KENNEDY, with whom JUSTICE BREYER joins as to Part I, concurring in the judgment.

I

Despite remarkable advances and achievements by medical science, and agreement among many professionals that even severe mental illness is often treatable, the extent of public resources to devote to this cause remains controversial. Knowledgeable professionals tell us that our society, and the governments which reflect its attitudes and preferences, have yet to grasp the potential for treating mental disorders, especially severe mental illness. As a result, necessary resources for the endeavor often are not forthcoming. During the course of a year, about 5.6 million, Americans will suffer from severe mental illness. E. Torrey, Out of the Shadows 4 (1997). Some 2.2 million of these persons receive no treatment. *Id.,* at 6. Millions of other Americans suffer from mental disabilities of less serious degree, such as mild depression. These facts are part of the background against which this case arises. In addition, of course, persons with mental disabilities have been subject to historic mistreatment, indifference, and hostility. See, *e. g., Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 461–464 (1985) (Marshall, J., concurring in judgment in part and dissenting in part) (discussing treatment of the mentally retarded).

Despite these obstacles, the States have acknowledged that the care of the mentally disabled is their special obligation. They operate and support facilities and programs, sometimes elaborate ones, to provide care. It is a continu-

ing challenge, though, to provide the care in an effective and humane way, particularly because societal attitudes and the responses of public authorities have changed from time to time.

Beginning in the 1950's, many victims of severe mental illness were moved out of state-run hospitals, often with benign objectives. According to one estimate, when adjusted for population growth, "the actual decrease in the numbers of people with severe mental illnesses in public psychiatric hospitals between 1955 and 1994 was 92 percent." Brief for American Psychiatric Association et al. as *Amici Curiae* 21, n. 5 (citing Torrey, *supra*, at 8–9). This was not without benefit or justification. The so-called "deinstitutionalization" has permitted a substantial number of mentally disabled persons to receive needed treatment with greater freedom and dignity. It may be, moreover, that those who remain institutionalized are indeed the most severe cases. With reference to this case, as the Court points out, *ante*, at 593, 603, it is undisputed that the State's own treating professionals determined that community-based care was medically appropriate for respondents. Nevertheless, the depopulation of state mental hospitals has its dark side. According to one expert:

> "For a substantial minority . . . deinstitutionalization has been a psychiatric *Titanic*. Their lives are virtually devoid of 'dignity' or 'integrity of body, mind, and spirit.' 'Self-determination' often means merely that the person has a choice of soup kitchens. The 'least restrictive setting' frequently turns out to be a cardboard box, a jail cell, or a terror-filled existence plagued by both real and imaginary enemies." Torrey, *supra*, at 11.

It must be remembered that for the person with severe mental illness who has no treatment the most dreaded of confinements can be the imprisonment inflicted by his own mind,

which shuts reality out and subjects him to the torment of voices and images beyond our own powers to describe.

It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act of 1990 (ADA) to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision. The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference. It is a common phenomenon that a patient functions well with medication, yet, because of the mental illness itself, lacks the discipline or capacity to follow the regime the medication requires. This is illustrative of the factors a responsible physician will consider in recommending the appropriate setting or facility for treatment. JUSTICE GINSBURG's opinion takes account of this background. It is careful, and quite correct, to say that it is not "the ADA's mission to drive States to move institutionalized patients into an inappropriate setting, such as a homeless shelter . . . ." *Ante*, at 605.

In light of these concerns, if the principle of liability announced by the Court is not applied with caution and circumspection, States may be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition. This danger is in addition to the federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts. It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers.

## II

With these reservations made explicit, in my view we must remand the case for a determination of the questions the Court poses and for a determination whether respondents can show a violation of 42 U. S. C. § 12132's ban on discrimination based on the summary judgment materials on file or any further pleadings and materials properly allowed.

At the outset it should be noted there is no allegation that Georgia officials acted on the basis of animus or unfair stereotypes regarding the disabled. Underlying much discrimination law is the notion that animus can lead to false and unjustified stereotypes, and vice versa. Of course, the line between animus and stereotype is often indistinct, and it is not always necessary to distinguish between them. Section 12132 can be understood to deem as irrational, and so to prohibit, distinctions by which a class of disabled persons, or some within that class, are, by reason of their disability and without adequate justification, exposed by a state entity to more onerous treatment than a comparison group in the provision of services or the administration of existing programs, or indeed entirely excluded from state programs or facilities. Discrimination under this statute might in principle be shown in the case before us, though further proceedings should be required.

Putting aside issues of animus or unfair stereotype, I agree with JUSTICE THOMAS that on the ordinary interpretation and meaning of the term, one who alleges discrimination must show that she "received differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic." *Post*, at 616 (dissenting opinion). In my view, however, discrimination so defined might be shown here. Although the Court seems to reject JUSTICE THOMAS' definition of discrimination, *ante*, at 598, it asserts that unnecessary institutional care does lead to "[d]issimilar treatment," *ante*, at 601. According to the Court, "[i]n order to receive needed medical services, persons with mental dis-

abilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Ibid.*

Although this point is not discussed at length by the Court, it does serve to suggest the theory under which respondents might be subject to discrimination in violation of § 12132. If they could show that persons needing psychiatric or other medical services to treat a mental disability are subject to a more onerous condition than are persons eligible for other existing state medical services, and if removal of the condition would not be a fundamental alteration of a program or require the creation of a new one, then the beginnings of a discrimination case would be established. In terms more specific to this case, if respondents could show that Georgia (i) provides treatment to individuals suffering from medical problems of comparable seriousness, (ii) as a general matter, does so in the most integrated setting appropriate for the treatment of those problems (taking medical and other practical considerations into account), but (iii) without adequate justification, fails to do so for a group of mentally disabled persons (treating them instead in separate, locked institutional facilities), I believe it would demonstrate discrimination on the basis of mental disability.

Of course, it is a quite different matter to say that a State without a program in place is required to create one. No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities. If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate. The judgment, however, is a political one and not within the reach of the statute. Grave constitutional concerns are raised when a federal court is given the author-

ity to review the State's choices in basic matters such as establishing or declining to establish new programs. It is not reasonable to read the ADA to permit court intervention in these decisions. In addition, as the Court notes, *ante*, at 592, by regulation a public entity is required only to make "reasonable modifications in policies, practices, or procedures" when necessary to avoid discrimination and is not even required to make those if "the modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7) (1998). It follows that a State may not be forced to create a community-treatment program where none exists. See Brief for United States as *Amicus Curiae* 19–20, and n. 3. Whether a different statutory scheme would exceed constitutional limits need not be addressed.

Discrimination, of course, tends to be an expansive concept and, as legal category, it must be applied with care and prudence. On any reasonable reading of the statute, § 12132 cannot cover all types of differential treatment of disabled and nondisabled persons, no matter how minimal or innocuous. To establish discrimination in the context of this case, and absent a showing of policies motivated by improper animus or stereotypes, it would be necessary to show that a comparable or similarly situated group received differential treatment. Regulations are an important tool in identifying the kinds of contexts, policies, and practices that raise concerns under the ADA. The congressional findings in 42 U. S. C. § 12101 also serve as a useful aid for courts to discern the sorts of discrimination with which Congress was concerned. Indeed, those findings have clear bearing on the issues raised in this case, and support the conclusion that unnecessary institutionalization may be the evidence or the result of the discrimination the ADA prohibits.

Unlike JUSTICE THOMAS, I deem it relevant and instructive that Congress in express terms identified the "isolat[ion] and segregat[ion]" of disabled persons by society as a "for[m]

of discrimination," §§ 12101(a)(2), (5), and noted that discrimination against the disabled "persists in such critical areas as . . . institutionalization," § 12101(a)(3). These findings do not show that segregation and institutionalization are always discriminatory or that segregation or institutionalization are, by their nature, forms of prohibited discrimination. Nor do they necessitate a regime in which individual treatment plans are required, as distinguished from broad and reasonable classifications for the provision of health care services. Instead, they underscore Congress' concern that discrimination has been a frequent and pervasive problem in institutional settings and policies and its concern that segregating disabled persons from others can be discriminatory. Both of those concerns are consistent with the normal definition of discrimination—differential treatment of similarly situated groups. The findings inform application of that definition in specific cases, but absent guidance to the contrary, there is no reason to think they displace it. The issue whether respondents have been discriminated against under § 12132 by institutionalized treatment cannot be decided in the abstract, divorced from the facts surrounding treatment programs in their State.

The possibility therefore remains that, on the facts of this case, respondents would be able to support a claim under § 12132 by showing that they have been subject to discrimination by Georgia officials on the basis of their disability. This inquiry would not be simple. Comparisons of different medical conditions and the corresponding treatment regimens might be difficult, as would be assessments of the degree of integration of various settings in which medical treatment is offered. For example, the evidence might show that, apart from services for the mentally disabled, medical treatment is rarely offered in a community setting but also is rarely offered in facilities comparable to state mental hospitals. Determining the relevance of that type of evidence would require considerable judgment and anal-

ysis.  However, as petitioners observe, "[i]n this case, no class of similarly situated individuals was even identified, let alone shown to be given preferential treatment."  Brief for Petitioners 21.  Without additional information regarding the details of state-provided medical services in Georgia, we cannot address the issue in the way the statute demands. As a consequence, the judgment of the courts below, granting partial summary judgment to respondents, ought not to be sustained.  In addition, as JUSTICE GINSBURG's opinion is careful to note, *ante*, at 604, it was error in the earlier proceedings to restrict the relevance and force of the State's evidence regarding the comparative costs of treatment.  The State is entitled to wide discretion in adopting its own systems of cost analysis, and, if it chooses, to allocate health care resources based on fixed and overhead costs for whole institutions and programs.  We must be cautious when we seek to infer specific rules limiting States' choices when Congress has used only general language in the controlling statute.

I would remand the case to the Court of Appeals or the District Court for it to determine in the first instance whether a statutory violation is sufficiently alleged and supported in respondents' summary judgment materials and, if not, whether they should be given leave to replead and to introduce evidence and argument along the lines suggested above.

For these reasons, I concur in the judgment of the Court.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Title II of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, as set forth in 42 U. S. C. § 12132, provides:

> "Subject to the provisions of this subchapter, no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities

of a public entity, *or be subjected to discrimination* by any such entity." (Emphasis added.)

The majority concludes that petitioners "discriminated" against respondents—as a matter of law—by continuing to treat them in an institutional setting after they became eligible for community placement. I disagree. Temporary exclusion from community placement does not amount to "discrimination" in the traditional sense of the word, nor have respondents shown that petitioners "discriminated" against them "by reason of" their disabilities.

Until today, this Court has never endorsed an interpretation of the term "discrimination" that encompassed disparate treatment among members of the *same* protected class. Discrimination, as typically understood, requires a showing that a claimant received differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic. This interpretation comports with dictionary definitions of the term discrimination, which means to "distinguish," to "differentiate," or to make a "distinction in favor of or against, a person or thing based on the group, class, or category to which that person or thing belongs rather than on individual merit." Random House Dictionary 564 (2d ed. 1987); see also Webster's Third New International Dictionary 648 (1981) (defining "discrimination" as "the making or perceiving of a distinction or difference" or as "the act, practice, or an instance of discriminating categorically rather than individually").

Our decisions construing various statutory prohibitions against "discrimination" have not wavered from this path. The best place to begin is with Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, the paradigmatic anti-discrimination law.[1] Title VII makes it "an unlawful em-

---

[1] We have incorporated Title VII standards of discrimination when interpreting statutes prohibiting other forms of discrimination. For example, Rev. Stat. § 1977, as amended, 42 U. S. C. § 1981, has been interpreted to forbid all racial discrimination in the making of private and

ployment practice for an employer . . . to *discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a)(1) (emphasis added). We have explained that this language is designed "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971).[2]

Under Title VII, a finding of discrimination requires a comparison of otherwise similarly situated persons who are in different groups by reason of certain characteristics provided by statute. See, *e. g., Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 683 (1983) (explain-

---

public contracts. See *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604, 609 (1987). This Court has applied the "framework" developed in Title VII cases to claims brought under this statute. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 186 (1989). Also, the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. §623(a)(1), prohibits discrimination on the basis of an employee's age. This Court has noted that its "interpretation of Title VII . . . applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.'" *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 121 (1985) (quoting *Lorillard* v. *Pons*, 434 U. S. 575, 584 (1978)). This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U. S. C. §1681 *et seq.*, which prohibits discrimination under any federally funded education program or activity. See *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 75 (1992) (relying on *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57 (1986), a Title VII case, in determining that sexual harassment constitutes discrimination).

[2] This Court has recognized that two forms of discrimination are prohibited under Title VII: disparate treatment and disparate impact. See *Griggs*, 401 U. S., at 431 ("The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"). Both forms of "discrimination" require a comparison among classes of employees.

ing that Title VII discrimination occurs when an employee is treated "'in a manner which but for that person's sex would be different'") (quoting *Los Angeles Dept. of Water and Power* v. *Manhart,* 435 U. S. 702, 711 (1978)). For this reason, we have described as "nonsensical" the comparison of the racial composition of different classes of job categories in determining whether there existed disparate impact discrimination with respect to a particular job category. *Wards Cove Packing Co.* v. *Atonio,* 490 U. S. 642, 651 (1989).[3] Courts interpreting Title VII have held that a plaintiff cannot prove "discrimination" by demonstrating that one member of a particular protected group has been favored over another member of that same group. See, *e. g., Bush* v. *Commonwealth Edison Co.,* 990 F. 2d 928, 931 (CA7 1993), cert. denied, 511 U. S. 1071 (1994) (explaining that under Title VII, a fired black employee "had to show that although he was not a good employee, equally bad employees were treated more leniently by [his employer] if they happened not to be black").

Our cases interpreting § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, which prohibits "discrimination" against certain individuals with disabilities, have applied this commonly understood meaning of discrimination. Section 504 provides:

> "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be sub-

---

[3] Following *Wards Cove,* Congress enacted the Civil Rights Act of 1991, Pub. L. 102–166, 105 Stat. 1071, as amended, which, *inter alia,* altered the burden of proof with respect to a disparate impact discrimination claim. See *id.,* § 105 (codified at 42 U. S. C. § 2000e–2(k)). This change highlights the principle that a departure from the traditional understanding of discrimination requires congressional action. Cf. *Field* v. *Mans,* 516 U. S. 59, 69–70 (1995) (Congress legislates against the background rule of the common law and traditional notions of lawful conduct).

jected to discrimination under any program or activity receiving Federal financial assistance."

In keeping with the traditional paradigm, we have always limited the application of the term "discrimination" in the Rehabilitation Act to a person who is a member of a protected group and faces discrimination "by reason of his handicap." Indeed, we previously rejected the argument that §504 requires the type of "affirmative efforts to overcome the disabilities caused by handicaps," *Southeastern Community College* v. *Davis*, 442 U. S. 397, 410 (1979), that the majority appears to endorse today. Instead, we found that §504 required merely "the evenhanded treatment of handicapped persons" relative to those persons who do not have disabilities. *Ibid.* Our conclusion was informed by the fact that some provisions of the Rehabilitation Act envision "affirmative action" on behalf of those individuals with disabilities, but §504 itself "does not refer at all" to such action. *Ibid.* Therefore, "[a] comparison of these provisions demonstrates that Congress understood accommodation of the needs of handicapped individuals may require affirmative action and knew how to provide for it in those instances where it wished to do so." *Id.*, at 411.

Similarly, in *Alexander* v. *Choate*, 469 U. S. 287, 302 (1985), we found no discrimination under §504 with respect to a limit on inpatient hospital care that was "neutral on its face" and did not "distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having," *id.*, at 302. We said that §504 does "not . . . guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed." *Id.*, at 304.

Likewise, in *Traynor* v. *Turnage*, 485 U. S. 535, 548 (1988), we reiterated that the purpose of §504 is to guarantee that individuals with disabilities receive "evenhanded treatment"

relative to those persons without disabilities. In *Traynor*, the Court upheld a Veterans' Administration regulation that excluded "primary alcoholics" from a benefit that was extended to persons disabled by alcoholism related to a mental disorder. *Id.*, at 551. In so doing, the Court noted that "[t]his litigation does not involve a program or activity that is alleged to treat handicapped persons less favorably than nonhandicapped persons." *Id.*, at 548. Given the theory of the case, the Court explicitly held: "There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." *Id.*, at 549.

This same understanding of discrimination also informs this Court's constitutional interpretation of the term. See *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298 (1997) (noting with respect to interpreting the Commerce Clause, "[c]onceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities"); *Yick Wo* v. *Hopkins*, 118 U. S. 356, 374 (1886) (condemning under the Fourteenth Amendment "illegal discriminations between persons in similar circumstances"); see also *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 223–224 (1995); *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493–494 (1989) (plurality opinion).

Despite this traditional understanding, the majority derives a more "comprehensive" definition of "discrimination," as that term is used in Title II of the ADA, one that includes "institutional isolation of persons with disabilities." *Ante*, at 600. It chiefly relies on certain congressional findings contained within the ADA. To be sure, those findings appear to equate institutional isolation with segregation, and thereby discrimination. See *ibid.* (quoting §§ 12101(a)(2) and 12101(a)(5), both of which explicitly identify "segregation" of persons with disabilities as a form of "discrimination"); see also *ante*, at 588–589. The congressional findings, however, are written in general, hortatory terms and pro-

vide little guidance to the interpretation of the specific language of § 12132. See *National Organization for Women, Inc.* v. *Scheidler*, 510 U. S. 249, 260 (1994) ("We also think that the quoted statement of congressional findings is a rather thin reed upon which to base a requirement"). In my view, the vague congressional findings upon which the majority relies simply do not suffice to show that Congress sought to overturn a well-established understanding of a statutory term (here, "discrimination").[4] Moreover, the majority fails to explain why terms in the findings should be given a medical content, pertaining to the place where a mentally retarded person is treated. When read in context, the findings instead suggest that terms such as "segregation" were used in a more general sense, pertaining to matters such as access to employment, facilities, and transportation. Absent a clear directive to the contrary, we must read "discrimination" in light of the common understanding of the term. We cannot expand the meaning of the term "discrimination" in order to invalidate policies we may find unfortunate. Cf. *NLRB* v. *Highland Park Mfg. Co.*, 341 U. S. 322, 325 (1951) (explaining that if Congress intended statutory terms "to have other than their ordinarily accepted meaning,

---

[4] If such general hortatory language is sufficient, it is puzzling that this or any other court did not reach the same conclusion long ago by reference to the general purpose language of the Rehabilitation Act itself. See 29 U. S. C. § 701 (1988 ed.) (describing the statute's purpose as "to develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living, for individuals with handicaps *in order to maximize their employability, independence, and integration* into the workplace and the community" (emphasis added)). Further, this section has since been amended to proclaim in even more aspirational terms that the policy under the statute is driven by, *inter alia*, "respect for individual dignity, personal responsibility, self-determination, and pursuit of meaningful careers, based on informed choice, of individuals with disabilities," "respect for the privacy, rights, and equal access," and "inclusion, integration, and full participation of the individuals." 29 U. S. C. §§ 701(c)(1)–(3).

it would and should have given them a special meaning by definition").[5]

Elsewhere in the ADA, Congress chose to alter the traditional definition of discrimination. Title I of the ADA, § 12112(b)(1), defines discrimination to include "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee." Notably, however, Congress did not provide that this definition of discrimination, unlike other aspects of the ADA, applies to Title II. Ordinary canons of construction require that we respect the limited applicability of this definition of "discrimination" and not import it into other parts of the law where Congress did not see fit. See, *e. g., Bates* v. *United States,* 522 U. S. 23, 29–30 (1997) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'") (quoting *Russello* v. *United States,* 464 U. S. 16, 23 (1983)). The majority's definition of discrimination—although not specifically delineated—substantially imports the definition of Title I into Title II by necessarily assuming that it is sufficient to focus exclusively on members of one particular

---

[5] Given my conclusion, the Court need not review the integration regulation promulgated by the Attorney General. See 28 CFR § 35.130(d) (1998). Deference to a regulation is appropriate only "'if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable.'" *Reno* v. *Bossier Parish School Bd.,* 520 U. S. 471, 483 (1997) (quoting *Presley* v. *Etowah County Comm'n,* 502 U. S. 491, 508 (1992)). Here, Congress has expressed its intent in § 12132, and the Attorney General's regulation—insofar as it contradicts the settled meaning of the statutory term—cannot prevail against it. See *NLRB* v. *Town & Country Elec., Inc.,* 516 U. S. 85, 94 (1995) (explaining that courts interpreting a term within a statute "must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of that term" (internal quotation marks omitted)).

group. Under this view, discrimination occurs when some members of a protected group are treated differently from other members of that same group. As the preceding discussion emphasizes, absent a special definition supplied by Congress, this conclusion is a remarkable and novel proposition that finds no support in our decisions in analogous areas. For example, the majority's conclusion that petitioners "discriminated" against respondents is the equivalent to finding discrimination under Title VII where a black employee with deficient management skills is denied in-house training by his employer (allegedly because of lack of funding) because other similarly situated black employees are given the in-house training. Such a claim would fly in the face of our prior case law, which requires more than the assertion that a person belongs to a protected group and did not receive some benefit. See, e. g., Griggs, 401 U. S., at 430–431 ("Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group").

At bottom, the type of claim approved of by the majority does not concern a prohibition against certain conduct (the traditional understanding of discrimination), but rather concerns imposition of a standard of care.[6] As such, the major-

---

[6] In mandating that government agencies minimize the institutional isolation of disabled individuals, the majority appears to appropriate the concept of "mainstreaming" from the Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, 20 U. S. C. § 1400 et seq. But IDEA is not an antidiscrimination law. It is a grant program that affirmatively requires States accepting federal funds to provide disabled children with a "free appropriate public education" and to establish "procedures to assure that, to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." §§ 1412(1), (5). Ironically, even under this broad affirmative mandate, we previously rejected a claim that IDEA required the "standard of care"

ity can offer no principle limiting this new species of "discrimination" claim apart from an affirmative defense because it looks merely to an individual in isolation, without comparing him to otherwise similarly situated persons, and determines that discrimination occurs merely because that individual does not receive the treatment he wishes to receive. By adopting such a broad view of discrimination, the majority drains the term of any meaning other than as a proxy for decisions disapproved of by this Court.

Further, I fear that the majority's approach imposes significant federalism costs, directing States how to make decisions about their delivery of public services. We previously have recognized that constitutional principles of federalism erect limits on the Federal Government's ability to direct state officers or to interfere with the functions of state governments. See, e. g., Printz v. United States, 521 U. S. 898 (1997); New York v. United States, 505 U. S. 144 (1992). We have suggested that these principles specifically apply to whether States are required to provide a certain level of benefits to individuals with disabilities. As noted in Alexander, in rejecting a similar theory under § 504 of the Rehabilitation Act: "[N]othing . . . suggests that Congress desired to make major inroads on the States' longstanding discretion to choose the proper mix of amount, scope, and duration limitations on services . . . ." 469 U. S., at 307. See also Bowen v. American Hospital Assn., 476 U. S. 610, 642 (1986) (plurality opinion) ("[N]othing in [§ 504] authorizes [the Secretary of Health and Human Services (HHS)] to commandeer state agencies . . . . [These] agencies are

analysis adopted by the majority today. See Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U. S. 176, 198 (1982) ("We think . . . that the requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children" (internal quotation marks omitted)).

not field offices of the HHS bureaucracy, and they may not be conscripted against their will as the foot soldiers in a federal crusade"). The majority's affirmative defense will likely come as cold comfort to the States that will now be forced to defend themselves in federal court every time resources prevent the immediate placement of a qualified individual. In keeping with our traditional deference in this area, see *Alexander, supra,* the appropriate course would be to respect the States' historical role as the dominant authority responsible for providing services to individuals with disabilities.

The majority may remark that it actually does properly compare members of different groups. Indeed, the majority mentions in passing the "[d]issimilar treatment" of persons with and without disabilities. *Ante,* at 601. It does so in the context of supporting its conclusion that institutional isolation is a form of discrimination. It cites two cases as standing for the unremarkable proposition that discrimination leads to deleterious stereotyping, *ante,* at 600 (citing *Allen* v. *Wright,* 468 U. S. 737, 755 (1984); *Manhart,* 435 U. S., at 707, n. 13)), and an *amicus* brief which indicates that confinement diminishes certain everyday life activities, *ante,* at 601 (citing Brief for American Psychiatric Association et al. as *Amici Curiae* 20–22). The majority then observes that persons without disabilities "can receive the services they need without" institutionalization and thereby avoid these twin deleterious effects. *Ante,* at 601. I do not quarrel with the two general propositions, but I fail to see how they assist in resolving the issue before the Court. Further, the majority neither specifies what services persons with disabilities might need nor contends that persons without disabilities need the same services as those with disabilities, leading to the inference that the dissimilar treatment the majority observes results merely from the fact that different classes of persons receive different services—not from "discrimination" as traditionally defined.

Finally, it is also clear petitioners did not "discriminate" against respondents "by reason of [their] disabili[ties]," as § 12132 requires. We have previously interpreted the phrase "by reason of" as requiring proximate causation. See, *e. g.*, *Holmes* v. *Securities Investor Protection Corporation,* 503 U. S. 258, 265–266 (1992); see also *id.*, at 266, n. 11 (citation of cases). Such an interpretation is in keeping with the vernacular understanding of the phrase. See American Heritage Dictionary 1506 (3d ed. 1992) (defining "by reason of" as "because of"). This statute should be read as requiring proximate causation as well. Respondents do not contend that their disabilities constituted the proximate cause for their exclusion. Nor could they—community placement simply is not available to those without disabilities. Continued institutional treatment of persons who, though now deemed treatable in a community placement, must wait their turn for placement does not establish that the denial of community placement occurred "by reason of" their disability. Rather, it establishes no more than the fact that petitioners have limited resources.

\*　　\*　　\*

For the foregoing reasons, I respectfully dissent.