RICHARD C., by his next friend KATHY B., on behalf of himself and all others similarly situated, et al., Plaintiffs,

Allegheny County, Plaintiff–Intervenor,

Western Center Board Of Trustees, Western Center Parents Group, Lee Nock and Cecelia Wrana, Plaintiff–Intervenors,

v.

Feather I. HOUSTOUN, Secretary, Department of Public Welfare, Commonwealth of Pennsylvania, et al., Defendants.

No. CIV.A. 89–2038.

United States District Court, W.D. Pennsylvania.

Sept. 29, 1999.

Jesse Torisky, Deer, Torisky & Associates, Pittsburgh, PA, Michael Pribanic, Pribanic & Pribanic, Pittsburgh, PA, Jere Krakoff, Pittsburgh, PA, for Plaintiff–Intervenors.

Patrick Quinn, Allegheny County Department of Law, Pittsburgh, PA, for Allegheny County.

Mark Murphy, Disabilities Law Project, Pittsburgh, PA, for Plaintiffs.

Howard Ulan, Department of Public Welfare, Office of Legal Counsel, Harrisburg, PA, for Defendants.

## MEMORANDUM

STANDISH, District Judge.

### I

In this civil action, plaintiffs, as class representatives for a class of Western Center residents, sought relief under 42 U.S.C. §§ 1396 *et seq.*, 1983 and 29 U.S.C. § 794 from defendants.[1] In September, 1992, after almost one year of settlement discussions, plaintiffs reached an agreement with the Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, the Deputy Secretary for Mental Retardation of the Department of Public Welfare and the Facility Director of Western Center (collectively DPW). After further negotiations based on the agreement, Allegheny County signed the agreement in February, 1993.

1. Western Center, located in Canonsburg, Pennsylvania, is an intermediate care facility for persons with mental retardation under Title XX of the Social Security Act.

2. During an eight day public hearing beginning on February 24, 1993 held for the purpose of addressing class certification and approval of the settlement agreement, the Western Center Board of Trustees, the Western Center Parents Group, Lee Nock and Cecelia Wrana opposed approval of the settlement agreement and sought decertification of the class.

By Order dated June 22, 1993, the court confirmed its preliminary certification of the class and approved the agreement signed by the parties.[2] Through the agreement, the civil action was settled.

Presently, before the court are two motions: (1) the motion of Daniel Torisky, Audrey Smith, Irene Keller and Laura Mooney (the family applicants) to intervene as of right, pursuant Fed.R.Civ.P. 24(a), in the above-captioned civil action and (2) the motion of Edward Torisky, Ralph Keller, Larry Smith and Susan Riley (the resident applicants), through their guardians and next friends, to intervene as of right, pursuant Fed.R.Civ.P. 24(a), in the above-captioned civil action.[3] For reasons that follow, the motions will be denied.

### II

An applicant petitioning to intervene in a civil action must comply with Federal Rule of Civil Procedure 24(a). Rule 24(a) provides as follows:

**(a) Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a).

The United States Court of Appeals for the Third Circuit has interpreted Rule 24(a)(2) to require an applicant seeking to intervene as of right to prove four elements:

3. Edward Torisky, Ralph Keller, Larry Smith and Susan Riley are residents of Western Center and members of the class certified by the court on June 22, 1993. Daniel Torisky, Audrey Smith, Irene Keller and Laura Mooney are the "legal guardians and/or family members" of Edward Torisky, Larry Smith, Ralph Keller and Susan Riley, respectively.

Although the resident applicants do not identify their "guardians and next friend[s]," it is likely that they are the family applicants.

[F]irst, a timely application for leave to intervene; second, a sufficient interest in the litigation; third, a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action; and fourth, inadequate representation of the prospective intervenor's interest by existing parties to the litigation.

*Kleissler v. United States Forest Serv.*, 157 F.3d 964, 969 (3d Cir.1998) (citations omitted). "Although these requirements are intertwined, each must be met to support intervention as of right." *Harris v. Reeves*, 946 F.2d 214, 219 (3d Cir.1991).

## III

### A

Initially, the court will consider the families' motion. The family applicants seek to intervene in the above-captioned action in order to stay the outplacement of class members from Western Center into community-based treatment programs pending cessation of alleged violations of the agreement and federal law. The alleged violations include the following: (1) DPW's failure to evaluate, by December 1, 1992, class members "to determine whether a program of community supports and services is recommended" in violation of paragraph 3 of the agreement; (2) DPW's failure to provide residents or their family members with Health Care Financing Administration 2176 Waiver Beneficiary Choice Forms prior to outplacement planning;[4] (3) DPW's failure to permit involved family members or guardians to direct the person-centered planning process for each class member in violation of paragraph 3 of the agreement and section 6000(c)(3) of the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 6000(c)(3); (4) DPW's failure to take reasonable action to assure that Western Center retains its certification as an interim care facility for the mentally retarded (ICF/MR certification) in violation of paragraph 17 of the agreement; (5) DPW's violation of various subsections of sections 484.10, 484.16, 484.36, 484.52, 441.301, 441.302, 441.303 and 483.400 through 483.480 of Title 42 of the Code of Federal Regulations; (6) DPW's failure to comply with Part 1397 of Chapter XIII of Title 45 of the Code of Federal Regulations in its monitoring of the operations of entities providing community-based treatment programs to outplace class members; (7) class counsel's improper invocation of the dispute resolution process provided for in paragraph 15 of the agreement; (8) DPW's outplacement of residents despite their objections in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.*, as interpreted by the United States Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999); and (9) DPW's failure to recognize the primary decision-making role of class members' family and guardians in violation of the dictates of *Heller v. Doe*, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Plaintiffs also assert that these alleged violations of the agreement and federal law have led to various pending legislative and governmental actions.[5]

---

**4.** For a discussion of the federal program that permits states to offer home and community-based treatment programs to an individual instead of institutional care, *see Doe 1–13 By and Through Doe Sr. 1–13 v. Chiles*, 136 F.3d 709, 721 n. 21 (11th Cir.1998).

**5.** The other pending legislative and governmental actions include the following: (1) the June 2, 1997 adoption by the Pennsylvania House of Representatives of House Resolution Number 187 whereby a special task force (HR 187 task force) was formed to investigate DPW's multi-year plan and policy regarding closing state mental retardation institutions, of which Western Center is one; (2) the November, 1998 passage of House Bill 2261 by the Pennsylvania Senate and House of Representatives; (3) Pennsylvania Representative Russ Fairchild's May, 1998 prep-

aration of a list of twenty-eight legislative initiatives based upon the findings of the HR 187 task force; (4) the May, 1998 decision of Pennsylvania Auditor General Robert Casey, Jr. to conduct a performance audit survey and investigation of allegations of forced outplacement of Western Center residents; (5) the February, 1998 proposal of Larry Dunn, one of the commissioners for Allegheny County, Pennsylvania, to Pennsylvania Governor Thomas Ridge that forty acres of Western Center be reserved for use a "safety net" for failed outplacements of Western Center residents; and (6) the August, 1998 adoption by the County Commissioners Association of Pennsylvania of a resolution supporting a moratorium on the implementation of DPW's multi-year plan pending consideration of the twenty-eight legislative initiatives listed by Representative Fairchild.

The family applicants seek to intervene in the above-captioned action and to stay further outplacement of class members pending the outcome of the aforementioned legislative and governmental action. The family members also request that admissions to Western Center be reopened; that all outplaced class members be afforded the opportunity to return to Western Center; that the terms of the agreement be enforced; and that class counsel be removed.

## B

■ Plaintiffs and defendants argue that the Supreme Court's *Olmstead* decision does not provide the family applicants with a basis for intervention. The court agrees.

In *Olmstead,* the respondents, L.C. and E.W., two mentally retarded women, were confined for treatment in institutional settings. *Id.* at 119 S.Ct. at 2183. While both were confined, their treating psychiatrists concluded that their treatment needs could be met in community-based treatment programs instead of in institutional settings. *Id.* Both L.C. and E.W. desired outplacement into a community-based program. *See id.* at 2183–84.

Despite the desires of the respondents and the conclusions of their treating psychiatrists, the respondents remained in institutional settings. *Id.* Consequently, L.C. filed suit in the United States District Court for the Northern District of Georgia, alleging that her confinement in an institutional setting violated Sections 12131–34 of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq.,* and Section 1983 of Title 42 of the United States Code. *Id.* E.W. intervened in the action and asserted an identical claim. *Id.* at 2184.

The district court granted partial summary judgment in favor of the respondents, holding that "unnecessary institutional segregation of the disabled constitutes discrimination per se" in violation of the ADA. *Id.* In opposition to the respondents' motion, the appellants had argued that, because they were using all available funds to provide treatment to other disabled persons, any outplacement order would "fundamentally alter" Georgia's activity.[6] *Id.*

On appeal, the United States Court of Appeals for the Eleventh Circuit affirmed the district court's judgment. However, it remanded for a reconsideration of the appellants' cost-based defense, stating that the defense would fail "[u]nless the State can prove that requiring it to [expend additional funds in order to provide L.C. and E.W. with integrated services] would be so unreasonable given the demands of the State's mental health budget that it would fundamentally alter the service [the State] provides." *Id.*

The Supreme Court clearly stated that the issue that it was considering was the "proper construction of the anti-discrimination provision contained in the public services portion (Title II) of the Americans with Disabilities Act ..., 42 U.S.C. § 12132. Specifically, [the Supreme Court] confront[ed] the question whether the proscription of discrimination may require placement of persons with *mental disabilities in community settings rather than in institutions.*" *Id.* at 2181.

In confronting the issue before it, the Supreme Court examined the origins of the ADA and stated that "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited by the ADA. *Id.* at 2187. The Supreme Court examined Title II regulations, stating that "it would be inappropriate to remove a patient

The court notes that Governor Ridge disapproved House Bill 2261 on December 23, 1998. The court also notes that admissions to Western Center have been closed since 1988 and that, in January, 1998, Governor Ridge announced that Western Center would be closed on June 30, 1999. However, to date Western Center remains open.

In his affidavit dated May 28, 1999, Mark Murphy, counsel for plaintiffs, indicates that, as of that date, only 82 class members remained at Western Center. Also, the families of several class members have submitted letters to the court indicating that outplacement of class members from Western Center has continued.

6. A federal regulation "requires public entities to 'make reasonable modifications' to avoid 'discrimination on the basis of disability,' unless those modifications would entail a 'fundamenta[l] alter[ation]' " of the public entities' policies, practices or procedures. *Id.* at 2182 (citing 28 C.F.R. § 35.130(b)(7)).

from [a] more restrictive setting" absent a determination by state professionals that the patient met the " 'essential eligibility requirements' for habilitation in a community-based program." *Id.* at 2188. The Supreme Court also recognized that federal law did not require states to impose community-based treatment upon patients who did not desire it. *Id.*

Within the context of an analysis of the appellants' cost-based defense to the respondents' discrimination claims, the Supreme Court summarized its analysis of the Title II regulations, stating as follows:

> [T]he ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk. Nor is it the ADA's mission to drive States to move institutionalized patients into an inappropriate setting, such as a homeless shelter, a placement the State proposed, then retracted, for E.W.

*Id.* at 2189. The Supreme Court continued, stating that outplaced patients "may need institutional care from time to time" and "for [some] individuals, no placement outside the institution may ever be appropriate." *Id.* Based on its recognition that the ADA did not require states to phase out institutions, the Supreme Court observed that "the State must have more leeway" "to maintain a range of facilities and to administer services with an even hand . . ." *Id.*

The Supreme Court ultimately concluded as follows:

> States are *required* to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 2190 (emphasis added).

The family applicants interpret *Olmstead* to *preclude* the placement of an institutionalized disabled person in a community-based treatment program unless the three criteria set forth above are met. *See* Br. at 5–6, 7, 11. They argue that the continued outplacement of class members violates the agreement as well as *Olmstead*, as they interpret it, because DPW has outplaced class members without conducting proper evaluations or involving class members or their families in the person-centered planning process. *See supra* Part III.A.

The court rejects the family applicants' interpretation of *Olmstead*. In stating its conclusion, the Supreme Court clearly stated that it was considering the circumstances under which the ADA requires the placement of institutionalized disabled persons into community-based treatment programs. Contrary to the assertion of the family applicants, it does not logically follow that institutionalization is required if any one of the three *Olmstead* criteria is not met. Thus, the court concludes that *Olmstead* does not provide a basis for the intervention of the family applicants.[7]

### C

■ Having concluded that *Olmstead* does not provide a basis for the intervention of the family applicants, the court will consider the family applicants' remaining allegations underlying their motion for intervention. Plaintiffs and defendants argue that the family applicants' motion must be denied because it is not timely. For their part, the family applicants have not even mentioned the timeliness factor in their motion, let alone suggested that their motion is timely.

■ "Timeliness is not just a function of counting days; it is determined by the totality of the circumstances." *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181 (3d· Cir.1994) (citations omitted). The following factors should guide a court's inquiry into the timeliness of a motion to intervene as of right: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay."

---

7. In light of this conclusion, the court will not address plaintiffs' additional arguments regard- ing the family applicants' reliance on *Olmstead*.

*Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir.1995) (citation omitted). With respect to the third factor, the Third Circuit has stated that " 'to the extent the length of time an applicant waits before applying for intervention is a factor in determining timeliness, it should be measured from the point at which the applicant knew, or should have known, of the risk to its rights.' " *Mountain Top Condominium Ass'n*, 72 F.3d at 370 (citation omitted).

■ The first factor, the stage of the proceedings, is not a particularly instructive guide in the court's consideration of the family applicants' motion. Ordinarily, "a motion to intervene after entry of a decree should be denied except in extraordinary circumstances." *Delaware Valley Citizens' Council v. Commonwealth of Pa.*, 674 F.2d 970, 974 (3d Cir.1982) (citations omitted). However, because the family applicants seek to intervene in order to enforce the terms of the agreement, and they could not have done so until the agreement was approved by the court and the terms of the agreement were violated, "to ask how far the proceedings have gone is pointless." *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 780 n. 7 (3d Cir.1994) (considering a petition to intervene in order to challenge a confidentiality order entered in a settled case and stating that "[t]he standards articulated in ... *Delaware Valley* are ... not helpful in cases such as the instant one, where the intervenors do not wish to litigate the merits of the underlying suit, but rather only seek to litigate an ancillary issue, such as a protective or confidentiality order. For example, the factor [regarding the stage of the proceedings] will rarely be helpful in cases where the intervenor is challenging a confidentiality order over a settlement agreement, because the order usually takes effect upon the termination of an action."). Thus, the court turns to consider the remaining factors.

The second factor, the prejudice to the parties, clearly militates against intervention. When the family applicants filed their motion, the parties had already been implementing the provisions of the agreement for five-and-one-half years. As of January 15, 1999, only 98 of the original 384 class members remained at Western Center. The staff at Western Center has been "markedly" reduced, making the care of the class members remaining at Western Center "quite challenging," and parts of Western Center, including residential facilities for class members, have been closed. Additionally, although the June 30, 1999 closing of Western Center was postponed, the outplacement of class members continues, and the closing of Western Center is impending.

Permitting the family applicants to intervene would result in class members remaining in an institution that has been partially closed and is operated by a reduced staff. It would also "have serious consequences for residents as it would introduce a large element of uncertainty in the planning for their future ...." (D.Ex.A at 2 ¶ 6). Moreover, it would prevent the Commonwealth of Pennsylvania from closing an institution with respect to which it has publicly taken steps to close. Given the prejudice to the parties, as well as the family applicants' total failure to address the issue, the court concludes that this factor strongly counsels against intervention.

The third factor, the reason for the delay, also strongly counsels against intervention. The remaining allegations underlying the family applicants' intervention are premised upon a process that the parties had been using for five-and-one-half years when the family applicants filed their motion. It is noteworthy that the family applicants, without offering any reason for their delay, have moved to intervene at this late date. This failure to offer a reason for their delay is a sufficient basis upon which the court could deny the family applicants' motion. *See In re Gen. Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*, 1996 WL 683785, at *5 (E.D.Pa. Nov.25, 1996), *aff'd by* 134 F.3d 133 (3d Cir.1998).

Not only have the family applicants not offered a reason for their delay, the court is unable to conceive of a legitimate reason therefor. The evaluation process of which the family applicants complain should have been completed in December, 1992. They acknowledge that there has been inadequate

monitoring of community-based treatment programs for six years, just as they acknowledge that DPW, since the approval of the agreement, has not taken reasonable steps to ensure that Western Center retains its ICF/MR certification.[8] (Motion ¶¶ 27, 35). They have submitted evidence that reveals that, at least as early as April, 1997, class members' families were complaining about an alleged lack of involvement in the person-centered planning process.[9] With respect to the family applicants' allegation about the improper invocation of arbitration, the evidence submitted by the family applicants establishes that Ms. Keller was aware of and addressed this contention in a letter in early July, 1998, nearly six months before the family applicants filed their motion.[10] (App.Ex. B).

In addition to noting the readily apparent and lengthy delay on the part of the family applicants, the court notes that the above-captioned civil action and the circumstances surrounding the operating and impending closing of Western Center have been highly publicized. The agreement and its implementation have been closely monitored by the Western Center Board of Trustees and the Western Center Parents Group, groups that originally intervened in the above-captioned civil action but subsequently withdrew. As officers, Daniel Torisky has had extensive involvement with the former group, Laura Mooney with the latter.

As a result of the foregoing, the court concludes that the family applicants' motion to intervene is not timely.[11] Accordingly, the court will deny the motion of the family applicants. The court proceeds to consider the motion of the resident applicants.

## IV

### A

The resident applicants seek to intervene in the above-captioned civil action in order to enjoin their outplacement from Western Center pending cessation of alleged breaches of the agreement. The resident applicants allege that defendants have failed to comply, and the class representatives have failed to insist on compliance, with the following provisions of the agreement: (1) paragraph 3, pursuant to which DPW, by December 31, 1992, was to "evaluate each class member to determine whether a program of community supports and services is recommended;" (2) paragraph 7, pursuant to which DPW "shall allocate funds to placement counties necessary to develop and provide necessary and appropriate community supports and services" to class members who are removed from Western Center and placed in a community-based treatment program; and (3) paragraph 12, pursuant to which DPW is to develop a state-wide program of quality enhancements that includes monitoring of community-based treatment programs.[12]

In support of their allegations that the agreement has been breached, the resident applicants chronicle "a number of avoidable deaths and abuses [that] have occurred to outplaced residents" that have allegedly resulted from the breaches. Complaint ¶ 11. According to the resident applicants, one of the incidents involving "avoidable deaths and

---

8. Similarly, the family applicants indicate that the outplacement of class members, a process that was underway for five-and-one-half years when they filed their motion, was not preceded by a distribution of the necessary HCFA 2176 Beneficiary Waiver Forms. (Motion ¶ 12). This necessarily implies that the failure to distribute the forms has also been problem for at least five-and-one-half years.

9. Mr. Torisky, Ms. Mooney and the family applicants' counsel were privy to these complaints.
   This evidence does not preclude the possibility of prior complaints.

10. Mr. Torisky, Ms. Mooney and the family applicants' counsel were privy to this letter.

11. In light of this conclusion, the court will not address plaintiffs' and defendants' other arguments in opposition to the family applicants' motion.

12. In their brief, the resident applicants refer to violations of unspecified provisions of the United States Constitution and federal civil rights statutes. Also in their brief, the resident applicants state that their complaint in intervention asserts that the person-centered planning process for class members is not being conducted pursuant to paragraph 3 of the settlement agreement. However, these allegations do not appear in the complaint in intervention.

abuses" occurred in 1989, one in 1990, two in 1994, two in 1995, two in 1996, two in 1997 and one in June, 1998. *Id.* In addition to chronicling these incidents, the resident applicants have submitted a report dated January 27, 1999 from the Pennsylvania Department of the Auditor General (Department) in which the Department examines (1) the evaluations received by class members prior to their outplacement from Western Center, (2) the participation of family members in the outplacement process and (3) the rate of occurrence of abuse incidents in community-based treatment programs. (Resident Applicants' Ex.A).[13]

## B

■ Plaintiffs and defendants argue that the family applicants' motion must be denied because it is not timely. The resident applicants argue that their motion "is not untimely." Br. at 18. In support of their argument, the resident applicants assert that "there is no palpable prejudice to the existing parties should intervention be granted for [the] limited purpose [of enforcing the settlement agreement.]" They also invite the court to consider the prejudice to themselves should their motion be denied.

The factors relevant to the court's inquiry into the timeliness of a motion to intervene as of right are set forth above in Part III.C. As it did regarding the family applicants' motion, the court concludes that the first factor, the stage of the proceedings, is not a particularly instructive guide in the court's consideration of the resident applicants' motion. *See supra* Part IV.B. Thus, the court turns to consider the remaining factors.

The second factor, the prejudice to the parties, weighs against intervention. When the resident applicants filed their motion, the parties had already been implementing the provisions of the agreement for nearly six years. The additional considerations enumerated above in the court's discussion of the family applicants' motion are equally applicable to the resident applicants' motion. Given the prejudice to the parties, the court concludes that this factor strongly counsels against intervention.[14]

The third factor, the reason for the delay, also strongly counsels against intervention. The allegations underlying the resident applicants' motion are premised upon a process that the parties had been using for nearly six years when the resident applicants filed their motion. The alleged incidents of "avoidable deaths and abuses" began occurring as early as 1989 and, after the agreement was approved, continued as early as 1994. Even the last incident occurred approximately nine months before the resident applicants filed their motion.

Not only is the delay obviously considerable in terms of passage of time, the delay has not been explained by the resident applicants. Indeed, the resident applicants simply have not offered any explanation for the delay. As the court observed above, the resident applicants' failure to offer a reason for their delay is a sufficient basis upon which the court could deny the their motion. *See supra* Part III.C.

Not only have the resident applicants not offered a reason for their delay, the court is unable to conceive of a legitimate reason therefor. The processes of which the resident applicants complain had been underway for nearly six years when they filed their motion. This has been a highly-publicized case that has generated, either by itself or in connection with other causes, action by the Pennsylvania legislature, various county-level political bodies and state-wide associations as well as the Western Center Board of Trustees and the Western Center Parents Group, groups that originally intervened in the above-captioned action but subsequently withdrew. Evidence submitted to the court

---

13. Defendants have submitted a copy of a letter dated March 10, 1999 from Nancy R. Thaler, DPW's Deputy Secretary for Mental Retardation, to Richard Spiegelman, Chief Counsel in the Office of the Auditor General, in which Ms. Thaler indicates that the data upon with the Auditor General's report is based is incorrect.

14. The court rejects the resident applicants' invitation to consider how a denial of their motion will result in prejudice to their interests. They have not cited, and the court is not aware of, any precedent from the Third Circuit expressly stating or implicitly suggesting that such a consideration is required or would be appropriate.

reveals a great deal of organized correspondence, written on behalf of various class members, to which co-counsel, Daniel Torisky and Laura Mooney have been privy.

As a result of the foregoing, the court concludes that the resident applicants' motion to intervene in not timely.[15] Accordingly, the court will deny the motion of the resident applicants.

15. In light of this conclusion, the court will not address plaintiffs' and defendants' other arguments in opposition to the resident applicants' motion.