2005 ME 80

Ivan SUZMAN

v.

COMMISSIONER, DEPARTMENT OF HEALTH AND HUMAN SERVICES.

Supreme Judicial Court of Maine.

Argued: Jan. 11, 2005.

Decided: June 29, 2005.

Robert A. Levine, Esq. (orally), Portland, for plaintiff.

G. Steven Rowe, Attorney General, N. Paul Gauvreau, Asst. Atty. Gen. (orally), Augusta, for defendant.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Ivan Suzman appeals from a judgment entered in the Superior Court (Cumberland County, *Humphrey, J.*) affirming the decision of the Commissioner of the State of Maine Department of Health and Human Services (DHHS) reducing the number of hours of personal care attendant (PCA) services that Suzman is eligible for under the Medicaid program. Suzman

contends that (1) the Commissioner's decision to reduce his hours of PCA services is not supported by sufficient evidence; (2) the reduction of PCA services violates the Americans with Disabilities Act (ADA); and (3) the DHHS 90% rule under which his PCA services were reduced violates federal Medicaid regulations. While we affirm the Commissioner's factual finding of the level of care needed by Suzman, we remand to the Commissioner to address Suzman's ADA claim and his claim that the 90% rule violates Medicaid regulations.

## I. BACKGROUND

[¶ 2] Suzman suffers from Young Onset Parkinson's Disease, a degenerative disease that significantly affects his ability to engage in the normal activities of daily life. For several years, Suzman has received PCA services through the Medicaid waiver program[1] administered by DHHS. The waiver program provides for the payment of PCA services in order to allow disabled persons, like Suzman, to live in community settings, such as their own home, rather than in institutions, such as nursing facilities.

### A. Statutory and Regulatory Framework of the Medicaid Waiver Program

[¶ 3] A state may seek approval from the Centers for Medicare & Medicaid Services (CMS) of the federal Department of Health and Human Services to provide, in addition to the benefits already included in the state's Medicaid program, community-based services to individuals who would otherwise be institutionalized. 42 U.S.C.A. § 1396n(b)-(h) (West Supp.2005). A state's provision of home or community-based services is labeled a "waiver program" because the federal government waives certain Medicaid requirements that would otherwise constrain a state's ability to provide such services.[2] *Id.;* 42 C.F.R. § 430.25(d) (2004). The purpose of the waiver program is to provide services "to avoid institutionalization." 42 C.F.R. § 441.300 (2004). The home or community-based services are for individuals for "whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility." 42 U.S.C.A. § 1396n(c)(1).

[¶ 4] A state that obtains permission from CMS for a waiver program must certify that the program will be cost-neutral; that is, (1) the state agency's total expenditures for community-based services and other Medicaid services for waiver program participants will not exceed the total expenditures if such persons were institutionalized; and (2) the average per capita expenditures under the waiver program will not exceed 100% of the average per capita expenditures that would have been made for the level of care provided in institutions. 42 U.S.C.A. § 1396n(c)(2)(D);[3] 42 C.F.R. § 441.302(e), (f) (2004).[4]

---

1. The full name of the Medicaid waiver program is the Consumer Directed Home and Community–Based Personal Care Attendant Medicaid Waiver Program for the Physically Disabled.

2. The waiver program is briefly described in *Olmstead v. L.C.*, 527 U.S. 581, 601 n. 12, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

3. Title 42 U.S.C.A. § 1396n(c)(2)(D) (West Supp.2005) provides:

   (2) A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that—

   . . . .

   (D) under such waiver the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted . . . .

4. Title 42 C.F.R. § 441.302 (2004) provides that the federal government will not grant a

[¶ 5] To be eligible for Maine's Medicaid waiver program, a person must have a chronic or permanent condition with functional impairments that interfere with the person's ability to provide for his own care or to perform daily living tasks without assistance. 14 C.M.R. 10 144 101–249 § 22.02(C)(7) (2001). The person must be eligible for the level of care provided by nursing facilities or hospitals. 42 C.F.R. § 441.302(c)(1), (c)(2), (g) (2004); 14 C.M.R. 10 144 101–246, –248 §§ 22.01–13, 22.02(B) (2001).

[¶ 6] Maine obtained federal approval for its waiver program and received approval to renew the program for a five-year period. One of the strategies employed by DHHS to ensure compliance with the federal cost-neutrality requirements in its renewal application was promulgation of a regulation known as the 90% rule. The 90% rule provides that, in addition to other eligibility requirements that a consumer must meet, "[t]he projected cost of Waiver services needed by the consumer is estimated to be less than 90% of the aggregate average monthly cost of care in a nursing facility per Waiver year." 14 C.M.R. 10 144 101–248 § 22.02(C)(2) (2001).[5]

## B. The Americans with Disabilities Act

[¶ 7] Title II of the ADA prohibits public entities from discriminating against disabled individuals in the provision of public services:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C.A. § 12132 (West 1995).

[¶ 8] A "qualified individual with a disability" is defined as a person "with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.A. § 12131(2) (West 1995).

[¶ 9] Federal regulations governing Title II of the ADA require that a public entity administer programs "in the most integrated setting appropriate to the needs of

---

waiver to a state unless the state provides certain assurances.

> Section 441.302(e) requires a state to provide:
>> [a]ssurance that the average per capita fiscal year expenditures under the waiver will not exceed 100 percent of the average per capita expenditures that would have been made in the fiscal year for the level of care provided in a hospital, [nursing facility], or ICF/MR under the State plan had the waiver not been granted.
>
> Section 441.302(f) states that the State must provide:
>> [a]ssurance that the agency's actual total expenditures for home and community-based and other Medicaid Services under the waiver ... will not ... exceed 100 percent of the amount that would be incurred by the State's Medicaid program for these individuals, absent the waiver, in—
>> (1) A hospital;
>> (2) A [nursing facility]; or
>> (3) An ICF/MR.
>
> Further, "[t]hese expenditures must be reasonably estimated and documented by the agency," and "[t]he estimate must be on an annual basis and must cover each year of the waiver period." 42 C.F.R. § 441.302(e)(1), (2).

5. The 90% rule became effective July 1, 2001.

qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2004). This is referred to as the integration mandate. The "most integrated setting appropriate" means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. A at 543 (2004). Federal regulations also require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (2004).

█ [¶ 10] In interpreting Title II of the ADA and its governing regulations, the United States Supreme Court held that a public entity discriminates against an individual by reason of his disability when it unjustifiably isolates a disabled person in an institutional setting. *Olmstead v. L.C.,* 527 U.S. 581, 597, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). Unjustified institutional isolation is discrimination in violation of the integration mandate contained in 28 C.F.R. § 35.130(d). *See id.* When a state policy has the effect of discriminating against a disabled individual, the state is required to make a reasonable modification to that policy in order to prevent the discrimination, unless the modification would fundamentally alter the state's program that provides such services. *Townsend v. Quasim,* 328 F.3d 511, 516–17 (9th Cir.2003).

[¶ 11] In order to meet the integration mandate and the requirements of Title II, the Supreme Court held in *Olmstead* that states are required to provide community-based services when three factors exist: (1) the state's treatment professionals have determined that community-based services are appropriate; (2) the disabled individual does not oppose treatment; and (3) the provision of community-based services can be reasonably accommodated, taking into account the resources available to the state and the needs of other disabled individuals. 527 U.S. at 587, 119 S.Ct. 2176.

[¶ 12] According to *Olmstead,* a state is not required to provide community-based services if the state can demonstrate that, when taking resources and the needs of others into account, the program would be fundamentally altered. *Id.* Fundamental alteration is an affirmative defense, meaning that a state must prove that the requested modification to its policy would result in a fundamental alteration. *See id.* at 597, 119 S.Ct. 2176; *Townsend,* 328 F.3d at 520; 28 C.F.R. § 35.130(b)(7). While *Olmstead* establishes that a state's resource limitations must be taken into account, 527 U.S. at 587, 119 S.Ct. 2176, "budgetary constraints alone are insufficient to establish a fundamental alteration defense." *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 380 (3d Cir.2005) and cases cited therein.

## C. Suzman's Need for PCA Services

[¶ 13] DHHS contracts with Alpha One, a private entity that provides managerial medical services to assess and review consumers' needs for PCA services. In September 2001, the Commissioner found that Suzman was eligible for ninety-one hours of daytime and fourteen hours of nighttime PCA services on a weekly basis.[6] In December 2001, Alpha One reassessed Suzman's needs pursuant to a DHHS rule

---

6. Apparently, the assessment upon which the September 2001 Commissioner's decision was based preceded promulgation of the 90% rule, and, therefore, the September decision was not affected by the rule.

requiring that waiver program participants be assessed on a periodic basis. *See* 14 C.M.R. 10 144 101–253, –254 § 22.07–1 (2001). Alpha One determined that Suzman required seventy-four hours of daytime and fourteen hours of nighttime PCA services per week. Alpha One further determined that the seventy-four daytime hours should be reduced to sixty-three hours based on the application of the 90% rule. Pursuant to Alpha One's reassessment and application of the 90% rule, DHHS reduced Suzman's daytime PCA services to sixty-three hours.

[¶ 14] Suzman sought administrative review of the reduction of his PCA services. Suzman appeared with counsel at the administrative hearing. Appearing for DHHS was the Alpha One specialist, who testified about the Alpha One assessment. No documentary evidence was offered by DHHS. Suzman testified and offered several documents into evidence, including copies of letters between the Commissioner and CMS[7] concerning the Medicaid waiver program. Thereafter, the hearing officer issued a recommended decision.[8]

[¶ 15] The hearing officer recommended that Suzman's daytime PCA services be reduced to sixty-three and one-half hours. The hearing officer's factual findings demonstrate the following calculations based upon the testimony of the Alpha One assessor. The hearing officer found that the average monthly cost of care in a nursing facility was $3898.50 and that 90% of that amount was $3508.65. In other words, the monthly 90% cap was $3508.65. The hearing officer found that the cost of fourteen hours of nighttime services was $624.39 per month and that the Alpha One monthly management fee was $47.38. The hearing officer then deducted the total of the nighttime care and the management fee from $3508.65 (the monthly 90% cap) and arrived at $2823.43. Next, the hearing officer divided $2823.43 by $10.30, the hourly cost of PCA services, for a total of 275 hours per month or sixty-three and one-half hours per week.

[¶ 16] The DHHS Commissioner ultimately adopted the hearing officer's recommendation of sixty-three and one-half daytime PCA hours per week. Suzman appealed the Commissioner's decision to the Superior Court, which affirmed the decision.

D. Commissioner's Interpretation of the 90% Rule

[¶ 17] The 90% rule is an eligibility requirement in that it provides that, in addition to other eligibility requirements that a consumer must meet, "[t]he projected cost of Waiver services needed by the consumer is estimated to be less than 90% of the aggregate average monthly costs of care in a nursing facility per Waiver year." 14 C.M.R. 10 144 101–248 § 22.02(C)(2). Although the 90% rule appears to make consumers whose need exceeds the 90% cap ineligible for the waiver program, the Commissioner does not interpret the 90% rule in that fashion. Suzman's total need exceeded the 90% cap, but the Commissioner did not find Suzman ineligible for the waiver program. Instead, the Commissioner interprets the rule to mean that

---

7. The correspondence was to the Health Care Financing Administration, whose name was changed to the Centers for Medicare & Medicaid Services (CMS). 42 C.F.R. § 1000.10 (2004).

8. At the request of the Alpha One assessor, the hearing officer held the record open for three weeks to allow the Assistant Attorney General to review the evidence and submit written argument. The administrative record does not contain the written arguments. Apparently, no further evidence was submitted by DHHS.

the total expenditure for Suzman's PCA hours must be reduced to the level of 90% of the average monthly cost of care in a nursing facility. The hearing officer concluded, and the Commissioner adopted the hearing officer's decision, that: "[The 90% rule] requires that the total of all services received by an individual under the [waiver program] be less than 90% of nursing facility costs ($3,898.50/month)—which calculates to $3,508.65 per month."

[¶ 18] Thus, Maine's 90% rule creates a cap on the amount of services that some waiver program consumers can receive. That cap is 90% of the average monthly institutionalization cost in Maine. The 90% rule means that no consumer may receive waiver program benefits that cost more than the cap. Consumers whose needs are less than the 90% cap receive the full amount of benefits they need. The cap only affects those consumers whose needs exceed the 90% cap.

E. Evidence Related to Suzman's ADA Claim

[¶ 19] Suzman claimed at the administrative level that the reduction of his PCA services and the 90% rule violated his rights under the ADA. The hearing officer stated that the merits of Suzman's ADA claim could not be addressed at the administrative level, and that while the ADA issue may be one that can be raised in state or federal courts, "an administrative decision must be based on the applicable agency regulations." Although the Commissioner's decision does not mention the ADA claim, the Commissioner's decision states that the hearing officer's recommendation is adopted.

[¶ 20] DHHS did not present any evidence at the hearing relevant to the ADA claim. Suzman offered a packet of documents that was marked "Suzman # 6." One of the documents in Suzman # 6 purports to be a waiver renewal application, dated June 21, 2000.[9] This application states: "the average per capita expenditures under the waiver will not exceed ~~100~~ *90%* percent of the average per capita expenditures for the level(s) of care in item 2 of this request under the State plan that would have been made in that fiscal year had the waiver not been granted." "Item 2" refers to a provision in the application that states that the waiver is requested to provide "home and community-based services to individuals who, but for the provision of such services, would require [nursing facility] level(s) of care, the cost of which could be reimbursed under the approved Medicaid State plan." Also contained in Suzman # 6 is a letter from the Commissioner to CMS, which mentions, among many other items, the 90% cap and states: "We do not anticipate that this change will have an adverse effect on consumers because, based on higher projected nursing home rates, the new cap at 90% will be higher than the previous cap." There was no testimonial or other explanation of Suzman # 6.[10] The hearing officer

---

9. Although it appears from letters in Suzman # 6 that the June 21, 2000, application was revised several times, only one of those revisions is contained in the exhibit, and it is not readily apparent that the exhibit contains the latest revision. It is fairly obvious that Suzman # 6 consists of copies of documents, in no particular order, that Suzman obtained from DHHS and does not represent a complete documentation of the waiver application and extension process. The documents in Suzman # 6 contain handwritten notations, and some have as many as three different dates on them.

10. It is possible that DHHS gave the hearing officer a written explanation of Suzman # 6 when it submitted a written closing argument after the hearing. Because the record in the Superior Court did not contain that written argument, we have no way of knowing wheth-

made no factual findings concerning Suzman # 6.

[¶ 21] In spite of the fact that the hearing officer and the Commissioner declined to decide the ADA claim, the parties submitted written arguments to the Superior Court on the ADA claim. DHHS argued that the 90% rule was required to meet the federal fiscal parity requirements and any change to the waiver program could result in a termination of the waiver program by the federal authorities, thereby resulting in a fundamental alteration. Suzman argued that DHHS had failed to meet its burden of proving fundamental alteration.

[¶ 22] The Superior Court decided the ADA claim after reviewing the administrative record and making factual findings. The proceeding before the court was one for judicial review of administrative action pursuant to M.R. Civ. P. 80C and 5 M.R.S.A. §§ 11001–11007 (2002). The court had not been requested to take additional evidence, *see* M.R. Civ. P. 80C(e), nor was the judicial review action joined with an independent action, *see* M.R. Civ. P. 80C(i).[11]

## II. DISCUSSION

[¶ 23] We first discuss whether there was sufficient evidence for the Commissioner to reduce the level of daytime PCA services for Suzman from ninety-one daytime hours to seventy-four hours. Next, we consider Suzman's claim that the further reduction of his PCA service hours to sixty-three and one-half is invalid because it violates his federal statutory rights under the ADA. Finally, we briefly touch upon Suzman's claim that the 90% rule violates federal Medicaid regulations.

### A. Standard of Review

[¶ 24] When the Superior Court acts as an intermediate appellate court, we review the administrative decision directly. *Kelley v. Comm'r, Dep't of Human Servs.*, 591 A.2d 1300, 1303 (Me.1991). We vacate agency factual findings only when they are clearly erroneous. *Id.* We uphold the agency's findings if it "could have fairly and reasonably found the facts as it did." *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551, 555. Neither this Court nor the Superior Court, acting in an appellate capacity, is free to make factual findings independent of those made by the agency, *see Driscoll v. Gheewalla*, 441 A.2d 1023, 1026 (Me.1982), and the remedy for the failure of an agency to act on the matters properly before it is a remand to the agency, *Harrington v. Town of Kennebunk*, 459 A.2d 557, 561 (Me.1983).

### B. Reduction of Suzman's PCA Services

[¶ 25] Suzman argues that the record does not support the Commissioner's reduction of his daytime PCA hours from the ninety-one hours, to which he had been found entitled previously, to the seventy-four hours recommended by Alpha One. However, substantial evidence in the record supports the Commissioner's finding that Suzman's need for daytime PCA hours is seventy-four. Contrary to Suzman's contention, the fact that he had been assessed previously to need ninety-one hours combined with the fact that his disease is progressive does not compel the conclusion that the later assessment is not supported by competent evidence.

er such an explanation was presented to the hearing officer.

**11.** Although Suzman filed two actions in the Superior Court, the first was a request for a stay to keep his PCA hours from being re-

duced while the administrative appeal and judicial review were pending. The second action was pursuant to Rule 80C, and the court consolidated the two actions.

[¶ 26] There was evidence that Suzman's capacity to engage in daily activities is variable, that is, some days he is able to function on a higher level than on other days. The Alpha One assessor testified to the methodology she employed to conduct the assessment, the factors she considered, and the numerous questions she asked Suzman in reaching her conclusion. The methodology used by Alpha One assessors to determinate the necessary PCA hours is to consider the worst case scenario of the recipient based on the seven days prior to the assessment.[12] The assessor acknowledged that Suzman's symptomatology is variable, but testified that her assessment of seventy-four hours was based on the seven days prior to the assessment, and that the seventy-four-hour figure reflects the maximum number of PCA hours Suzman would need, assuming a worst case scenario. Based on this and other evidence in the record, the Commissioner could have fairly and reasonably found that Suzman required seventy-four daytime PCA hours.[13]

## C. Whether the Reduction of PCA Services Violates the ADA

■ [¶ 27] Suzman contends that the reduction of his PCA hours constitutes dis-

crimination on the basis of his disability in violation of the ADA. Although the Commissioner established Suzman's need of daytime PCA hours at seventy-four, the Commissioner reduced the number of hours to sixty-three and one-half. Suzman argued to the hearing officer that the reduction of his PCA hours violates the ADA, but the hearing officer and the Commissioner declined to address the claim.[14]

[¶ 28] Suzman chose to present his ADA claim at the administrative level. We have held that, pursuant to the doctrine of exhaustion of administrative remedies, claims should be made before an administrative agency so that the agency will have the opportunity to resolve the claim. *See New England Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife*, 550 A.2d 56, 59–60 (Me.1988). Whether a Title II ADA claimant is required to exhaust administrative remedies is not at issue here because of Suzman's choice to present the claim at the administrative level. The hearing officer declined to issue findings of fact or legal conclusions on the claim although evidence and argument had been presented.

[¶ 29] Instead of remanding the case to the Commissioner to make factual findings

---

**12.** Suzman did not contest Alpha One's methodology.

**13.** Whether Suzman is in need of ninety-one or seventy-four hours of PCA care seems, at first blush, to be irrelevant, given the application of the 90% rule, which limits his eligibility in the waiver program to sixty-three and one-half hours. Nonetheless, if it should be determined that the 90% rule is invalid or that any reduction of hours from the amount that Suzman needs violates the ADA, Suzman's level of need is a necessary fact.

**14.** In declining to decide the merits of Suzman's ADA claim, the hearing officer relied upon an administrative hearing regulation that states that an administrative decision has to be "based on the agency's regulations."

10 C.M.R. 10 144 001–23 § VII(B)(3)(a) (1996). Other provisions of the same hearing regulations, however, require hearing officers to decide constitutional issues, 10 C.M.R. 10 144 001–24 § VII(B)(6) (1996), and permit them to refer to state and federal statutes when "the agency's regulations are ambiguous or silent," 10 C.M.R. 10 144 001–23 § VII(B)(3)(b) (1996). The 90% rule is ambiguous, and there appears to be no other regulation addressing the ADA or its integration mandate. It would be ironic for hearing officers to have the authority to decide constitutional issues but not the authority to decide issues where a policy is claimed to be in violation of federal law.

and legal conclusions on the ADA claim, the Superior Court itself made findings and conclusions based on the administrative record. It was appropriate for the court to review the record as it pertained to the ADA claim in order to determine if Suzman actually stated a claim. If, as a matter of law, Suzman did not state an ADA claim, there would be no sense in remanding the claim to the Commissioner to consider it. It was not appropriate, however, for the court to supplant the Commissioner's fact-finding authority. We do not review the Superior Court's findings. We will remand the ADA claim to the Commissioner for factual findings and legal conclusions unless we determine that Suzman has failed to state an ADA claim.

[¶ 30] DHHS does not dispute that Suzman is a qualified individual with a disability under the ADA, 42 U.S.C.A. § 12131(2), or that DHHS is a public entity as defined in the ADA, 42 U.S.C.A. § 12131(1)(A), (B) (West Supp.2005). Nor does it dispute that it has determined that community-based placement is appropriate for Suzman's needs. *See Olmstead*, 527 U.S. at 587, 119 S.Ct. 2176. The appropriateness of community-based placement is apparent from the fact that Suzman has been taking part in the community-based waiver program successfully for several years and that the Commissioner's decision under appeal determines that he continues to be eligible for community-based placement. Suzman obviously does not oppose community-based treatment; he has brought this action to assert his right to it.

[¶ 31] DHHS argues that Suzman's ADA claim is not viable because he has not alleged or shown that he will be institutionalized if he is not afforded all of the PCA hours that the Commissioner has determined he needs. This contention lacks merit. As a person eligible for the waiver program, Suzman *by definition* is in need of institutionalization. 42 U.S.C.A. § 1396n(c)(1) (providing that the secretary may issue waivers permitting a state to offer home and community-based services only to individuals who need them in order to avoid institutionalization); *see also Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181–82 (10th Cir.2003) (concluding that *Olmstead* does not require that a claimant be currently institutionalized in order to enforce the integration requirement). By determining his need level at seventy-four hours, the Commissioner found that seventy-four is the number of PCA daytime hours that allows Suzman to function outside of an institution.

[¶ 32] DHHS also argues that by not presenting evidence as to actual expenses of the Medicaid program, Suzman failed to meet his burden of proving an ADA violation. DHHS misunderstands the burden upon an ADA claimant. As an ADA claimant, Suzman is required to show that he is a qualified individual who was discriminated against, in the receipt of services, by reason of his disability. *Townsend*, 328 F.3d at 516. There is little doubt that he meets this burden. Under *Olmstead* he has to show that DHHS has found that community-based services are appropriate for him and that he desires such services. *Olmstead*, 527 U.S. at 587, 119 S.Ct. 2176. DHHS already provides community-based services, and Suzman has requested a relatively modest modification of a state policy that has the effect of reducing the amount of services that he has been found to need. It is DHHS that has the burden to demonstrate that the requested modification is not reasonable because it would fundamentally alter the Medicaid program. *Townsend*, 328 F.3d at 517.

[¶ 33] Bare assertions that a fundamental alteration will occur, or that the waiver

program will be placed in jeopardy, are not sufficient to meet the burden of proving fundamental alteration in the absence of supporting evidence indicating that the program will in fact be jeopardized. *See, e.g., id.* at 520 (questioning whether the asserted additional costs would, *in fact,* compel cutbacks in services to other benefits recipients); *Fisher,* 335 F.3d at 1182–83 (noting that "the fact that [a state] has a fiscal problem, by itself, does not lead to an automatic conclusion that [the provision of integrated treatment] will result in a fundamental alteration").

[¶ 34] DHHS also argues that because CMS approved the waiver program proposal, which included the 90% rule, the rule is consistent with the ADA. However, the fact that the federal government found the waiver program proposal acceptable does not render the program immune from an ADA challenge, nor does it compel the conclusion that a fundamental alteration will result from a reasonable modification to it.

[¶ 35] We will not speculate as to what evidence DHHS would present to prove fundamental alteration. *Olmstead* and the post-*Olmstead* cases, such as *Townsend,* describe what may be required to prove fundamental alteration. The cases acknowledge that the total picture is relevant and that the complete range of services and available resources must be considered. *See, e.g., Olmstead,* 527 U.S. at 597, 119 S.Ct. 2176. We have previously recognized when discussing *Olmstead* that DHHS must administer its services with an even hand. *Bates v. Dep't of Behavioral & Developmental Servs.,* 2004 ME 154, ¶ 59, 863 A.2d 890, 905.

[¶ 36] DHHS may be discriminating against Suzman if it is failing to provide, in a community-based setting, services that are available under an existing program, and if it cannot show that provision of those services in a community-based setting will result in a fundamental alteration. Suzman's claim that the reduction of his PCA hours is a violation of the ADA appears viable. Whether DHHS will be able to demonstrate a fundamental alteration will depend upon the evidence it presents.

D. Suzman's Remaining Claim

[¶ 37] Suzman also contends that the 90% rule violates 42 C.F.R. § 441.302(e), (f). Those provisions of the federal regulations require that a state assure the federal government that the total expenditures for community-based and other Medicaid services for waiver program consumers will not exceed 100% of the amount that the state would expend for the consumers in a nursing facility and that the average per person expenditures of the waiver program will not exceed 100% of the average per person expenses that would be made for consumers in a nursing facility. 42 C.F.R. § 441.302(e), (f). Suzman's argument is somewhat difficult to follow but he appears to argue that it is not reasonable for DHHS to cap expenditures for each consumer at 90% of the nursing facility costs when the federal regulations require only that the per capita average not exceed 100% of the nursing facility costs. The hearing officer also refused to address this argument giving the same reason he gave for not addressing the ADA claim. Because we are remanding the case to the Commissioner on the ADA claim and because the evidence is likely to be similar on both claims, we will remand this claim as well.

The entry is:

The judgment of the Superior Court is affirmed insofar as it affirms the Commissioner's factual decision that Suzman is in need of seventy-four hours of daytime PCA care. The judgment of the Superior Court is vacated on the ADA claim and the

claim asserting a violation of the federal Medicaid regulations. The matter is remanded to the Superior Court for the purpose of remanding to the Commissioner with instructions consistent with this opinion.